# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GLORIA JAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 8931-VCL |
| | ) | |
| NATIONAL FINANCIAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: December 15, 2015
Date Decided: March 14, 2016

Richard H. Cross, Jr., Christopher P. Simon, CROSS & SIMON, LLC, Wilmington, Delaware; Alexander J. Pires, Jr, Diane E. Cooley, PIRES COOLEY, Washington, DC; *Attorneys for Plaintiff Gloria James.*

Edward T. Ciconte, Daniel C. Kerric, CICONTE, SCERBA & KERRICK, LLC, Wilmington, Delaware; Kenneth M. Dubrow, THE CHARTWELL LAW OFFICES, Philadelphia, Pennsylvania; *Attorneys for Defendant National Financial, LLC.*

**LASTER, Vice Chancellor.**

Defendant National Financial, LLC ("National") is a consumer finance company that operates under the trade name Loan Till Payday. In May 2013, National loaned $200 to plaintiff Gloria James (the "Disputed Loan"). National described the loan product as a "Flex Pay Loan." In substance, it was a one-year, non-amortizing, unsecured cash advance.

The terms of the Disputed Loan called for James to make twenty-six, bi-weekly, interest-only payments of $60, followed by a twenty-seventh payment comprising both interest of $60 and the original principal of $200. The total repayments added up to $1,820, representing a cost of credit of $1,620. According to the loan document that National provided to James, the annual percentage rate ("APR") for the Disputed Loan was 838.45%.

James defaulted. After National rejected her request for a workout agreement, she filed this action seeking to rescind the Disputed Loan. She proved at trial that the Disputed Loan was unconscionable, resulting in an order of rescission. She also proved that National violated the federal Truth in Lending Act, resulting in an award of statutory damages plus attorneys fees and costs.

## I.    FACTUAL BACKGROUND

Trial took place on September 21, 22, and 24, 2015. The parties submitted seventy-two exhibits, introduced live testimony from six fact witnesses, called two expert witnesses, and lodged five depositions. The following facts were proven by a preponderance of the evidence.

1

## A. Hardworking But Poor

James is a resident of Wilmington, Delaware. From 2007 through 2014, James worked in the housekeeping department at the Hotel DuPont. In May 2013, when she obtained the Disputed Loan, James earned $11.83 per hour. As a part-time employee, her hours varied. On average, after taxes, James took home approximately $1,100 per month.

James' annualized earnings amounted to roughly 115% of the federal poverty line, placing her among what scholars call the working poor.[1] Contrary to pernicious stereotypes of the poor as lazy, many work extremely hard.[2] James exemplified this attribute. She got her first job at age thirteen and has been employed more or less continuously ever since. Her jobs have included stints in restaurants, at a gas station, as a dental assistant, as a store clerk, and at a metal plating company. In 2007, she obtained her position with the Hotel DuPont. She was laid off on December 31, 2014, when the

---

[1] Oxfam America, *Hard Work, Hard Lives: Survey Exposes Harsh Reality Faced by Low-Wage Workers in the US* 2 (2013) ("A common definition of 'the working poor' is people earning less than twice the poverty level . . . ."); *see* Annual Update of the HHS Poverty Guidelines, 78 Fed. Reg. 5,182, 5,183 (Jan. 24, 2013) (establishing poverty line for a single-person household at $11,490 per year).

[2] Oxfam America, *supra*, at 1 (citing a survey which "found that America's working poor have a strong work ethic, put in long hours, and believe that hard work can pay off. . . . The survey found that most low-wage workers barely scrape by month to month, are plagued by worries about meeting their families' basic needs, and often turn to loans from family or friends, credit card debt, pawn shops and payday loans, and government programs just to get by."); *see also* U.S. Bureau of Labor Statistics, Dep't of Labor, *A Profile of the Working Poor, 2013* 5 (2015) (explaining that there is a "sizable group of full-time workers who live below the poverty threshold," which can be explained by "low earnings").

hotel reduced its part-time staff.

**B.      James' Use Of Credit**

James is undereducated and financially unsophisticated. She dropped out of school in the tenth grade because of problems at home. Approximately ten years later, she obtained her GED.

Around the same time she obtained her position with the Hotel DuPont, James attempted to improve her skills by enrolling in a nine-month course on medical billing and coding. For seven months, she worked from 8:00 a.m. to 4:00 p.m. at the hotel, then attended classes starting at 5:00 p.m. She was also taking care of her school-age daughter. Two months before the end of the program, the schedule became too much and she dropped out. James thought she received a grant to attend the program, but after dropping out she learned she actually had taken out a student loan. She eventually repaid it.

James does not have a savings account or a checking account. She has no savings. She uses a Nexis card, which is a pre-paid VISA card.

In May 2013, when she took out the Disputed Loan, James had been using high-interest, unsecured loans for four to five years. She obtained loans from several finance companies. She used the loans for essential needs, such as groceries or rent. On at least one occasion, she used a loan from one provider to pay off an outstanding loan from another provider.

Before the Disputed Loan, James had obtained five prior loans from National. James believed that she repaid those loans in one or two payments. The payment history for the loans shows otherwise.

For her first loan from National, James borrowed $100 on September 1, 2011. She repaid a total of $205 by making five payments over the course of two months.

- 9/9/11 – Payment of $30.00.

- 9/21/11 – Payment of $80.00.

- 10/7/11 – Payment of $15.00.

- 10/21/11 – Payment of $15.00.

- 11/3/11 – Payment of $65.00.

For her second loan, James borrowed $100 on August 22, 2012. She again repaid a total of $205, this time by making four payments over the course of two months.

- 9/7/12 – Payment of $30.00.

- 9/21/12 – Payment of $30.00.

- 10/5/12 – Payment of $80.00.

- 10/19/12 – Payment of $65.00.

For her third loan, James borrowed $150 on October 31, 2012, less than two weeks after repaying her second loan. She repaid a total of $252 by making three payments over the course of two months.

- 11/16/12 – Payment of $100.00.

- 11/30/12 – Payment of $28.50.

- 12/14/12 – Payment of $123.50.

For her fourth loan, James borrowed $100 on December 20, 2012, one week after repaying her third loan. She repaid it the next day by making a single payment of $102. The prompt repayment suggests that James refinanced her loan through another provider.

For her fifth loan, James borrowed $200 on December 27, 2012, less than one week after repaying her fourth loan. James failed to make the second payment, failed to make the fourth payment, and finally repaid the loan two months later. Her repayments totaled $393.

- 1/11/13 – Payment of $60.00.

- 1/24/13 – Attempted debit of $60 declined.

- 1/29/13 – Attempted debit of $60 declined.

- 2/8/13 – Payment of $73.00.

- 2/22/13 – Attempted debit of $60 declined.

- 2/27/13 – Payment of $260.00.

Despite James' difficulty in repaying her fifth loan, National sent her text messages soliciting her interest in another loan. A text message on March 29, 2013, stated, "Loan Til [sic] Payday welcomes you with open arms. If you ever need a loan again we want to be your source! :)" A text message on April 5, 2013, stated, "Loan Til [sic] Payday misses you! Call NOW and receive $20 off your first payment."

## C.     The Disputed Loan

On May 7, 2013, James needed money for food and rent. She went to National's "Loan Till Payday" storefront operation at 1935 West Fourth Street in Wilmington, Delaware. At the time, National operated fourteen stores in Delaware.

James dealt with Ed Reilly, National's general manager. In that capacity, Reilly oversaw National's business operations and supervised its loan approvals. He also filled in at stores from time to time. He happened to be working in the store at 1935 West Fourth Street when James came in for a loan.

James told Reilly that she wanted to borrow $200. Reilly looked up James in the computer program that National uses to track its customers and their loans, which is known as the "Payday Loan Manager." It has a main page for each customer that provides identifying information and the account's status. It also has tabs that allow the user to review information about current or past loans, including the payment history, and to enter and review notes about the loans.

James was a customer in good standing, meaning that she did not have to fill out a new loan application. She provided Reilly with her Nexis card, two recent paystubs, and her driver's license.

Using the internet, Reilly pulled up James' Nexis card account history for the preceding sixty days and printed out a copy. It showed that James started the period with a positive balance on her card of $384.70. During the sixty days, she received direct deposit credits totaling $2,216.58 and incurred debits totaling $2,594.38, for negative cash flow of $377.80. Her ending balance was $6.90, and she had a pending authorization for that amount. Her available cash was zero.

During the sixty day period, James' Nexis card was declined fourteen times. Reilly testified at trial that if someone's transaction history showed three or four declines, then they probably should not receive a loan.

6

After reviewing her transaction history, Reilly offered to loan James $400 rather than $200. The $400 would have represented almost 40% of James' after-tax monthly income. Reilly offered that amount because National has a policy of loaning borrowers up to 40% of their after-tax monthly income, regardless of their other expenditures. National only checks to "make sure they're positive on payday." Tr. 244 (Vazquez); *see* Tr. 472 (Reilly) ("[S]he started with a surplus.").

James declined the offer of $400. She only wanted $200, and she did not believe she could repay $400.

James thought she was getting a payday loan with a block rate of "$30 on $100." As James understood it, this meant she would pay $60 to borrow the $200.

Lenders developed the block rate concept to describe the finance charge for a traditional payday loan, which was a single-payment loan designed to be repaid on the borrower's next payday. National's trade name—Loan Till Payday—embodies this concept. Because the loan was technically intended to be outstanding only for a single block of time, payday loan companies described the finance charge by identifying the dollar amount per $100 borrowed that the customer would owe at the end of the period. A block rate of "$30 on $100" meant that a customer who borrowed $100 would repay $130 on her next payday.

In May 2013, when James approached National for a $200 loan, National was no longer making traditional payday loans. Effective January 1, 2013, the General Assembly amended Delaware's statutory framework for closed-end consumer credit to impose limits on payday loans. *See* 78 Del. Laws ch. 278 (2012) (codified at 5 *Del. C.* §§ 2227,

7

2235A, 2235B, & 2235C) (the "Payday Loan Law").

In response to the Payday Loan Law, National recast its payday loans as non-amortizing installment loans that were structured to remain outstanding for seven to twelve months. The Payday Loan Law only applied to loans designed to be outstanding for sixty days or less, so by making this change, National sidestepped the law. Throughout this litigation, National insisted that it no longer made payday loans.

Despite shifting to longer-dated installment loans, National continued to frame its finance charges using a block rate. National adhered to this practice for a simple reason: It made a high cost loan product sound cheaper than it was. On an annualized basis, a customer who repays $100 by making an interest-only payment of $30 every two weeks followed by $130 at the end of a year pays $810 in interest for an annualized rate of 838%. By framing the interest as a block rate, National's employees could tell customers that the interest rate was 30%. Although National's customers eventually saw an APR on the loan agreement, National's employees followed a practice of telling customers that the APR had "nothing to do with the loan." Tr. 335 (Carter). As National pitched it, the APR was "irrelevant" unless the customer kept the loan outstanding for an entire year; if the customer only planned to keep the loan outstanding for a few weeks, National's employees said that the APR "means nothing."[3]

---

[3] Tr. 337-38 (Carter). It is true that the APR calculation changes depending on when the customer repays the loan, but the APR for a block rate of "$30 on $100" remains high. James originally planned to repay her loan in two payments of $130. Had she done so, the APR would have been 630.3272%.

When James obtained the Disputed Loan, she focused on the block rate and the concept of $30 in interest per $100 borrowed, just as National intended. She thought she would have to pay back $260. She told Reilly that she would repay the loan in two payments of $130 each. She planned to pay $130 on her next payday of May 17, 2013, and another $130 on May 31.

James told Reilly that she wanted to make her payments in cash and that she did not want to have her Nexis card debited. James viewed this as important because she knew from past experience that she could incur additional charges if a lender debited her account when there were insufficient funds to make a payment, particularly if the lender attempted to debit her account multiple times. Reilly entered a note in the Payday Loan Manager reflecting that James did not want to have electronic debits from her account. The note stated "No ACH debits," using the abbreviation for the automated clearinghouse for electronic payments operated by the Federal Reserve and the National Automated Clearing House Association. JX 29B at 659. He entered another comment stating,

As National learned the hard way, it is difficult to convert a block rate into an accurate APR. During 2013, the Delaware State Banking Commissioner questioned the accuracy of the APRs in National's loan agreements. After several audits, National changed how it calculates interest on its loan products. Effective January 1, 2014, National no longer uses a block rate. During each payment period, National instead charges simple interest at a rate of either 1% or 2% daily, depending on whether the payment period is two weeks or one month. At the end of each payment period, the amount of interest is totaled and either paid by the borrower or added to the loan balance. Using the banking conventions of a 30-day month and a 360-day year, the economic substance of 2% simple interest per day is the same as the block rate: $30 per $100 borrowed. National employees now call its products "1 percent loans" and "2 percent loans." Tr. 335, 336 (Carter).

"Customer wants to walk in cash payments." *Id.*

Reilly also entered a note in the Payday Loan Manager reflecting James' plan to repay the loan in two payments. But Reilly's note contemplated different payments than what James understood she would be making. Reilly recorded that James would make one payment of $150 on May 17 and a second payment of $143 on May 31. Reilly's note thus had James repaying $293. James thought she was repaying $260.

Reilly printed out a copy of National's standard form loan document and showed James where to sign. The loan document was titled "Delaware Consumer Installment Loan Agreement." JX 19 at 1 (the "Loan Agreement"). In a box labeled "Type of Contract," it said "FlexPay." The repayment schedule did not reflect either the two repayments that James wanted to make or the two repayments that Reilly entered in the Payday Loan Manager. The Loan Agreement instead contemplated twenty-six interest-only payments of $60 each, followed by a balloon payment comprising a twenty-seventh interest payment of $60 plus repayment of the original $200 in principal. The total amount of interest was $1,620. According to the Loan Agreement, the APR for the loan was 838.45%. Using Reilly's planned repayment schedule, the APR was 1,095%.

James signed the Loan Agreement, and Reilly gave her a check. From the time James walked into the store, the whole process took about twenty minutes.

## D. James Cannot Repay The Loan.

On May 8, 2013, the day after obtaining the Disputed Loan, James broke her hand while cleaning a toilet at the Hotel DuPont. After missing an entire week of work, she asked her supervisor to allow her to return because she could not afford to remain out any

10

longer. As James explained at trial: "I don't get paid if I don't work." Tr. 34 (James). Her supervisor agreed that she could work two or three days per week on light duty.

On May 17, 2013, James went to the Loan Till Payday store and made the first interest payment of $60. She spoke with Brian Vazquez, the store manager. She told him that she had broken her hand and would not be able to work, and she asked him to accommodate her with some type of arrangement. Vazquez told her that she would have to make the scheduled payments and that National would debit her account if she did not pay in cash. Vazquez then suggested that James *increase* her payment from $60 to $75. James was nonplussed and asked him, "How can I pay $75 if I can't pay $60 interest." Tr. 36 (James). Vazquez responded that being able to work fewer hours was not the same as losing her job.

At trial, Vazquez recalled that when James asked for help, he suggested that she increase her payment. He tried to portray this as an accommodation that was advantageous to James, because the additional money would pay down principal. Leaving aside the obvious problem that his proposal contemplated James paying more when she could not pay less, it was not an accommodation. James had the right to pre-pay principal at any time. Vazquez offered James something that she already had.

Vazquez also testified that he wanted James to make payments to "keep[] her active, not past due, so she was still in good standing with our company and able to get loans with us in the future." Tr. 257 (Vazquez). Yet Vazquez testified later that if a customer missed a payment, then National would stop charging interest and only add a late fee of 5%. This meant that Vazquez proposed an arrangement that kept interest

11

accruing, whereas if James had defaulted, then interest would have stopped and she only would have owed a $3 late fee.

At bottom, Vazquez refused to lower James' payments or give her any kind of accommodation. His proposals tried to get National more money and faster.

## E.     James Defaults.

On May 31, 2013, National attempted on four separate occasions to debit James' Nexis account for $60. Each time, the debit was declined. At trial, Vazquez justified the debits by distinguishing between an electronic debit from a Nexis card and an ACH withdrawal from a bank account. Vazquez claimed that James only told National not to make ACH withdrawals.

Despite being a stickler for this distinction, Vazquez was less punctilious when it came to National's authority for taking the debit. For that purpose, Vazquez relied on a provision found on the last page of the Loan Agreement, which was titled "Credit Card Authorization." Vazquez asserted that this provision applied because a credit card payment and a debit card payment were "the same thing." Tr. 287 (Vazquez). It is true that from a consumer's perspective, they are functionally the same thing, but so are a bank account and a Nexis card.[4] National tried to have it both ways, taking a legalistic

---

[4] There is significant popular confusion regarding the differences between credit cards and debit cards. *See* Ronald J. Mann, *Making Sense of Payments Policy in the Information Age*, 93 Geo. L.J. 633, 655-56 (2005) [hereinafter *Making Sense of Payments*]. "While credit cards and debit cards look similar, they are fundamentally different." Stephen Wilks, *The Governance Ecology of Electronic Food Stamp Delivery: Is It Time for A New Praxis?*, 30 Harv. J. Racial & Ethnic Just. 311, 318 n.30 (2014);

approach when that advanced its purposes, then taking a functional approach when that was advantageous.

On June 3, 2013, National tried twice more to debit James' Nexis card, each time for $60. Both debits were declined. On June 7, National tried twice more. At that point, the attempted debits were for $63, which included a $3 late fee. Both were declined.

On June 8, 2013, an unidentified National employee called James at the Hotel DuPont and left a message with her employer. National also sent her a "Collection Text"

---

*accord* Tr. 602-03 (Zywicki). Credit cards offer a line of credit, and credit card payments are processed over private credit card networks, such as those operated by Visa and MasterCard. As part of the Consumer Credit Protection Act, consumers have greater protection and access to remedies compared to other payment methods. *See* Ronald J. Mann, *Payment Systems and Other Financial Transactions* 158-59 (5th ed. 2011) [hereinafter *Payment Systems*] ("One of the most distinctive features of the current credit-card system is that it gives the consumer a right to cancel payment that is much broader than the consumer's rights in any of the competing systems.").

Unlike a credit card, a "debit card necessarily is tied to a particular bank account." Ronald J. Mann, *Credit Cards and Debit Cards in the United States and Japan*, 55 Vand. L. Rev. 1055, 1099 (2002). A debit card is thus like a digital checkbook: "the payment comes from the cardholder's bank account at the time of the transaction or, at most, a few days later." *Making Sense of Payments*, *supra*, at 649. "[U]nlike a credit card, a debit card does not reflect an independent source of funds." *Payment Systems*, *supra*, at 200.

Debit cards offer two types of transactions: PIN-based and PIN-less. PIN-based transactions flow through regional and national networks established exclusively for debit card transactions, and the payment is generally withdrawn immediately. PIN-less transactions use the credit card networks.

The ACH network is a different animal. "The ACH network is a nationwide computerized counterpart to the checking system, parallel to (but separate from) the networks used for transactions on credit cards or on debit cards. The network is used for electronic transfers between accounts at American financial institutions—most commonly for automated deposits of salaries and for automated payments for recurring bills (mortgages, car payments, and the like)." *Id.* at 221.

stating, "Gloria, to avoid further occurrences on your account, you must call Tracey, at Loan Till Payday."

On June 13, 2013, an unidentified National employee again called James at the Hotel DuPont and left a message with her employer. That same day, National successfully made an ACH withdrawal of $63, comprising $60 in interest plus a $3 late fee. Recall that James had told National not to make electronic withdrawals, and that Reilly had entered a note on the account stating "No ACH debits." Recall also that National justified debiting her Nexis card on the theory that a debit was different than an ACH withdrawal. At this point, however, National made an ACH withdrawal.

On June 14, 2013, the notes in the Payday Loan Manager indicate that an unidentified National representative spoke with James. On June 27, National debited her Nexis account for $75. National also sent James an automated text: "Refer a friend and get $20 credit on your next payment! Call now! Loan Till Payday."

### F.    James Hires Counsel And Files Suit In Federal Court.

After her discussion with Vazquez on May 17, 2013, James decided to contact counsel. On June 14, James sent a letter to National opting out of the arbitration provision in the Loan Agreement. On July 1, James filed suit in the United States District Court for the District of Delaware. *James v. Nat'l Fin., d/b/a Loan Till Payday LLC*, C.A. No. 13-CV-1175-RGA (D. Del. filed July 1, 2013).

Tim McFeeters is the sole owner of National. On July 8, 2013, after being served with the federal action, he entered a note in the Payday Loan Manager: "DONT WORK DONT CALL DONT TAKE ANY $$$." JX 29B at 662.

14

As of July 8, 2013, James had repaid National $197. She has not made any payments on the Disputed Loan since then.

## G.    This Litigation

On September 20, 2013, after voluntarily dismissing her federal action, James filed this lawsuit on behalf of herself and other similarly situated borrowers. Count I of the complaint sought a permanent injunction barring National from collecting on the loans made to James and other class members. Count II sought a declaration that the terms of National's loan documents were unconscionable. Count III alleged that National breached the implied covenant of good faith and fair dealing inherent in the loan agreements. Count IV alleged that National unjustly enriched itself at the expense of the class members. Count V alleged violations of the Delaware Consumer Fraud Act, 6 *Del. C.* §§ 2511-2527. James later dropped Counts IV and V.

On October 10, 2013, National moved to compel arbitration. National also sought to dismiss the complaint under the creative theory that James could not state a claim for a class action. I denied the motion to dismiss, noting that James had opted out of arbitration and that National's arguments against class certification were premature.

When National moved to compel arbitration, it knew that James had opted out. National had made that point affirmatively as a ground for dismissing her federal action. Because National knew that their motion to compel arbitration had no factual basis, James moved for Rule 11 sanctions. I granted the motion.

15

## H.     Problems With Discovery

During discovery, James sought documents and information relating to the loans offered by National since September 20, 2010, including an electronic copy of the data from any database containing the loan information. National moved for a protective order, contending that the discovery was overbroad. I partially granted National's motion, but I also required National to respond to particular requests or narrowed versions. *See* Dkt. 44 (the "First Discovery Order"). Most pertinently, I required National to provide specified categories of information about loans made between September 20, 2010, and September 30, 2013 (the "Loan History Information").

On February 28, 2014, National produced an Excel spreadsheet that purported to provide the Loan History Information (the "Initial Spreadsheet"). The Initial Spreadsheet did not include all of the Loan History Information.

Using the few loan documents he had, James' counsel checked the APRs for those loans against the limited data provided on the Initial Spreadsheet. The figures did not match. He then deposed McFeeters, who suggested that the Initial Spreadsheet contained errors. McFeeters also testified that the Delaware State Banking Commission had audited National between four and ten times after he purchased the company and had expressed concerns about inaccurate APRs.

On May 6, 2014, James filed an amended complaint that added a claim that National violated the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1501 *et seq.*, by failing to accurately disclose APRs on its loan agreements. James sought further discovery regarding the APR issue. On July 17, James again moved to compel production

of the Loan History Information. I entered a second order requiring National to provide it. Dkt. 120 (the "Second Discovery Order").

National did not comply with the Second Discovery Order, resulting in a written decision granting James' motion for sanctions. *See James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *1 (Del. Ch. Dec. 5, 2014). The decision held that because of National's discovery misconduct, it was established for purposes of trial that the APRs disclosed on an updated spreadsheet of Loan History Information were incorrect and fell outside the tolerance permitted by TILA. *Id.*

On March 25, 2015, I denied James' motion for class certification. The case proceeded to trial solely on James' individual claims.

## II.    LEGAL ANALYSIS

James proved at trial that the Loan Agreement was unconscionable, and the Disputed Loan is rescinded on that basis. Because the Disputed Loan is invalid, this decision need not consider whether National breached the implied covenant of good faith and fair dealing. James also proved that National violated TILA.

### A.    The Regulatory And Public Policy Backdrop

This case was about the Disputed Loan, but both sides litigated against a backdrop of regulatory and public policy issues that numerous jurisdictions are confronting. Put mildly, widespread controversy exists over high-interest credit products that are predominantly marketed to and used by lower-income, credit-impaired consumers. Products falling into this category include traditional payday loans, pawnbroker loans, installment loans, subprime credit cards, automobile title loans, income tax refund

17

products, and credit substitutes like rent-to-own financing. Labels for the category include "fringe products" and "alternative financial services." The products fall within the larger heading of subprime credit.

An extensive and growing body of scholarship exists about alternative financial products, with the bulk focusing on traditional payday loans. The empirical evidence to date, however, has considerable gaps. Studies have reached different findings, and researchers have drawn different inferences.[5] Moreover, although the total volume of scholarship is large, much of it seems repetitive and polarized.

Consumer groups uniformly condemn alternative financial products.[6] The Pew

_____

[5] For example, some scholars have found a correlation between payday loans and certain types of bankruptcy filings. *See* JX 46 at 45 n.45 (identifying authorities); JX 49 at PL87-88 (same); Nathalie Martin & Koo Im Tong, *Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy*, 39 Sw. L. Rev. 785, 788 (2010) [hereinafter *Payday Loans and Bankruptcy*]; *see also* Rebecca Borné et al., Ctr. for Responsible Lending, *Big Bank Payday Loans: High-Interest Loans Through Checking Accounts Keep Customers in Long-Term debt* 3 (2011) (citing research showing that "payday lending can lead to negative financial outcomes for borrowers; these include difficulty paying other bills, difficulty staying in their home or apartment, trouble getting health care, increased risk of credit card default, loss of checking accounts, and bankruptcy"). Others have found no correlation at all or a correlation between eliminating payday lending and increasing bankruptcy filings. *See* JX 46 at 46 nn.46 & 47 (identifying authorities).

[6] For example, in 2013, the AARP, the Center for Responsible Lending, the Consumer Federation of America, the Leadership Conference on Civil and Human Rights, the NAACP, the National Consumer Law Center, and the National Council of La Raza jointly submitted a white paper to the FDIC and the Office of the Comptroller of the Currency seeking restrictions on payday lending. *See* JX 49. Other policy papers by these groups and similar organizations include: Nicholas Bianchi, Nat'l People's Action, *Profiting from Poverty: How Payday Lenders Strip Wealth from the Working-Poor for Record Profits* (2012); Borné et al., *supra*; Keith Ernst et al., Ctr. for Responsible

Charitable Trust has published a series of reports that criticize the payday loan industry.[7]

The Department of Defense and representatives of the armed services also have opposed payday lending.[8] Aligned with these groups are scholars who write from the consumer perspective. Nathalie Martin, a law professor from the University of Arizona, is a leading critic of alternative financial products.[9] She testified as an expert for James at trial.

---

Lending, *Quantifying the Economic Cost of Predatory Payday Lending* (2004); Uriah King & Leslie Parish, Ctr. for Responsible Lending, *Springing the Debt Trap: Rate Caps Are Only Proven Payday Lending Reform* (2007); Uriah King et al., Ctr. for Responsible Lending, *Financial Quicksand: Payday Lending Sinks Borrowers in Debt with $4.2 Billion in Predator Fees Every Year* (2006).

[7] *See* Pew Charitable Trusts, *Payday Lending in America: How Borrowers Choose and Repay Payday Loans* (2013) [hereinafter *How Borrowers Repay*]; Pew Charitable Trusts, *Payday Lending in America: Policy Solutions* (2013); Pew Charitable Trusts, *Payday Lending in America: Who Borrows, Where They Borrow, and Why* (2012) [hereinafter *Who Borrows*].

[8] *See* Dep't of Defense, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006).

[9] Martin's extensive writings on the subject include: Timothy E. Goldsmith & Nathalie Martin, *Interest Rate Caps, State Legislation, and Public Opinion: Does The Law Reflect The Public's Desires?*, 89 Chi.-Kent L. Rev. 115 (2014) [hereinafter *Interest Rate Caps*]; Nathalie Martin, *1000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions*, 52 Ariz. L. Rev. 563 (2010) [hereinafter *Good While Supplies Last*]; Nathalie Martin & Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 Mo. L. Rev. 41 (2012); Nathalie Martin & Ernesto Longa, *High-Interest Loans and Class: Do Payday and Title Loans Really Serve The Middle Class?*, 24 Loy. Consumer L. Rev. 524 (2012) [hereinafter *High Interest Loans and Class*]; *Payday Loans and Bankruptcy*, *supra*; Nathalie Martin, *Public Opinion and the Limits of State Law: The Case for Federal Usury Cap*, 34 N. Ill. U. L. Rev. 259 (2014) [hereinafter *Public Opinion*]; Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751 (2012).

Championing a competing view is the industry's national trade organization, the Community Financial Services Association of America, and a group of scholars who draw heavily on economic theory. Todd J. Zywicki, a law professor from George Mason University, is a prominent defender of alternative financial products and a co-author of a recent treatise on consumer credit. *See* Thomas A. Durkin et al., *Consumer Credit and the American Economy* (2014) [hereinafter *Consumer Credit*]. He testified as an expert for National at trial.

This court's task is not to regulate the payday loan industry in Delaware. It is only to rule on the Disputed Loan. *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994) ("It is the nature of the judicial process that we decide only the case before us. . . ."). Nevertheless, in the course of evaluating the record, I have read Martin's and Zywicki's expert reports, as well as many of the works that they cited. I agree with both experts that although the Disputed Loan was not technically a traditional payday loan, the literature provides helpful background.

**B.    Unconscionability**

The doctrine of unconscionability stands as a limited exception to the law's broad support for freedom of contract. "Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce." *ev3, Inc. v. Lesh*, 114 A.3d 527, 530 n.3 (Del. 2014). "There is . . . a strong American tradition of freedom of contract, and that tradition is especially strong in our State, which prides itself on having commercial laws that are efficient." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059-60 (Del. Ch. 2006) (Strine, V.C.). "When parties have ordered their affairs

20

voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005) (Strine, V.C.), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006). "As a matter of ordinary course, parties who sign contracts and other binding documents, or authorize someone else to execute those documents on their behalf, are bound by the obligations that those documents contain." *Official Comm. of Unsec. Motors Liquid. Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1015 (Del. 2014).

But as with many areas of the law, there are countervailing principles that prevent an indisputably important and salutary doctrine from operating as a tyrannical absolute. One such ground is unconscionability, traditionally defined as a contract "such as no man in his senses and not under delusion would make on the one hand, and no honest or fair man would accept, on the other." *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978) (quotation marks and citation omitted). It would be difficult to improve on Chancellor Allen's incisive summary of the interplay between the core concept of contractual freedom and the residual protection against unconscionability:

> The right of competent persons to make contracts and thus privately to acquire rights and obligations is a basic part of our general liberty. This ability to enter and enforce contracts is universally thought not only to reflect and promote liberty, but as well to promote the production of wealth. Thus, the right to make and enforce contracts is elemental in our legal order. But not every writing purporting to contain a promise or every document purporting to make a transfer will be given legal effect. A large body of law defines when valid contracts are formed and when and how they can be enforced.

21

. . . .

It is a general rule, recited by courts for well over a century, that the adequacy or fairness of the consideration that adduces a promise or a transfer is not alone grounds for a court to refuse to enforce a promise or to give effect to a transfer. This rule, present in 17th and 18th century cases, achieved its greatest dignity in the jurisprudence of 19th century classical liberalism. Thus, the classical liberal's premise concerning the subjectivity (and thus non-reviewability) of value has plainly been a dominant view in our contract law for a very long time. . . . But as standard as that generalization is, it has not precluded courts, on occasion, from striking down contracts or transfers in which inadequacy of price is coupled with some circumstance that amounts to inequitable or oppressive conduct. That is, the "rule" that courts will not weigh consideration or assess the wisdom of bargains has not fully excluded the opposite proposition, that at some point, courts will do so even in the absence of actual fraud, duress or incapacity.

*Ryan v. Weiner*, 610 A.2d 1377, 1380-81 (Del. Ch. 1992) (Allen, C.) (citations and footnote omitted).

In *Ryan*, Chancellor Allen delineated the history of the doctrine of unconscionability, describing it as "old when Justice Story summarized it in 1835" as part of his *Commentaries on Equity Jurisprudence*. *Id.* at 1381. After citing a range of cases from the twentieth century, Chancellor Allen observed that

[s]tatutory developments over the last thirty years reflect an explicit legislative endorsement of this ancient equitable doctrine. The most important example of this mid-twentieth century codification is the unconscionability provision contained in Section 2-302 of the Uniform Commercial Code. That provision has, of course, been adopted in almost all of the states and applies to the sale of all goods.

*Id.* at 1383. Delaware's version of Section 2-302 states:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the

application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

6 *Del. C.* § 2-302. Although technically limited in scope to sales of goods, Delaware decisions have applied Section 2-302 more broadly.[10]

This estimable pedigree does not mean that the doctrine of unconscionability will be invoked freely. "Unconscionability is a concept that is used sparingly." *Ketler v. PFPA, LLC*, --- A.3d ---, 2016 WL 192599, at *2 (Del. Jan. 15, 2016). Chancellor Allen's words again capture the essential point:

The notion that a court can and will review contracts for fairness is apt for good reason to strike us as dangerous, subjecting negotiated bargains to the loosely constrained review of the judicial process. Perhaps for this reason, courts have evoked this doctrine with extreme reluctance and only when all of the facts suggest a level of unfairness that is unconscionable.

*Ryan*, 610 A.2d at 1381. A finding of unconscionability generally requires "the taking of an unfair advantage by one party over the other." *Tulowitzki*, 396 A.2d at 960 (quotation marks omitted). "A court must find that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart." *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989). "For a contract clause to be unconscionable, its

---

[10] *See, e.g.*, *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119, 2014 WL 823407, at *9 (Del. Feb. 28, 2014) (ORDER) (testing whether amendment to restrictive covenants on land was unconscionable using Section 2-302); *Worldwide Ins. Gp. v. Klopp*, 603 A.2d 788, 790 (Del. 1992) (holding that features of an insurance contract could be "unconscionable within the meaning of" Section 2-302).

terms must be so one-sided as to be oppressive." *Id.* (quotation marks and citation omitted).

Whether a contract is unconscionable is determined at the time it was made. *Lecates v. Hertich Pontiac Buick Co.*, 515 A.2d 163, 173 (Del. Super. 1986); *see* Restatement (Second) of Contracts § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract. . . ."). The outcome turns on "the totality of the circumstances." *Tulowitzki*, 396 A.2d at 962; *see* Restatement (Second) of Contracts § 208, cmt. a ("The determination that a contract or term is or is not unconscionable is made in light of its setting, purpose and effect.").

This court has identified ten factors to guide the analysis of unconscionability. *See Fritz v. Nationwide Mut. Ins. Co.*, 1990 WL 186448 (Del. Ch. Nov. 26, 1990). In the language of the *Fritz* decision, they are:

> (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position[;]
>
> (2) a significant cost-price disparity or excessive price;
>
> (3) a denial of basic rights and remedies to a buyer of consumer goods[;]
>
> (4) the inclusion of penalty clauses;
>
> (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect[;]
>
> (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract[;]

24

(7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them;

(8) an overall imbalance in the obligations and rights imposed by the bargain;

(9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate[;] and

(10) inequality of bargaining or economic power.

*Id.* at *4-5 (citations omitted). Although this opinion uses the ten *Fritz* factors, it analyzes them in a different order and under two broader headings: substantive unconscionability and procedural unconscionability.

The concept of substantive unconscionability tests the substance of the exchange. An agreement is substantively unconscionable if the terms evidence a gross imbalance that "shocks the conscience." *Coles v. Trecothick*, 32 Eng. Rep. 592, 597 (Ch. 1804). In more modern terms, it means a bargain on terms "so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965) (quoting 1 Arthur L. Corbin, *Corbin on Contracts* § 128 (1963)).

The concept of procedural unconscionability examines the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining. Courts focus on the relative bargaining strength of the parties and whether the weaker party could make a meaningful choice. The concept is "broadly conceived to encompass not only the employment of sharp bargaining practices and the use of fine print and convoluted language, but a lack of understanding and an

inequity of bargaining power." 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.28, at 583-84 (3d ed. 2004) (footnotes omitted).

The two dimensions of unconscionability do not function as separate elements of a two prong test. The analysis is unitary, and "it is generally agreed that if more of one is present, then less of the other is required." *Id.* § 4.28, at 585.

### 1.     Factors Relating To Substantive Unconscionability

Six of the *Fritz* factors relate to the concept of substantive unconscionability. They are:

- A significant cost-price disparity or excessive price.

- The denial of basic rights and remedies.

- Penalty clauses.

- The placement of disadvantageous clauses in inconspicuous locations or among fine print trivia.

- The phrasing of disadvantageous clauses in confusing language or in a manner that obscures the problems they raise.

- An overall imbalance in the obligations and rights imposed by the bargain.

Within this lineup, the first factor tests for a threshold indication of fundamental unfairness. The second and third factors examine two types of contract terms where overreaching may occur. The fourth and fifth factors ask about other types of contract terms and whether they are adequately disclosed and comprehensible. The sixth factor examines the agreement as a whole.

### a.     A Threshold Indication Of Unfairness

The first *Fritz* factor considers whether there is a threshold indication of

unfairness, such as "a significant cost-price disparity or excessive price." *Fritz*, 1990 WL 186448, at *4. "[G]ross disparity between price and value can be used to demonstrate unconscionability."[11] "Inadequacy of consideration does not of itself invalidate a bargain, but gross disparity in the values exchanged may be an important factor in a determination that a contract in unconscionable . . . ." Restatement (Second) of Contracts § 208, cmt. c. "Such a disparity may also corroborate indications of defects in the bargaining process . . . ." *Id.* "[A]n unreasonably high or exorbitant price at the very least is a factor to be considered in determining whether a particular provision is harsh and whether one party has in fact been imposed upon by another party in an inequitable or unconscionable manner." 8 *Williston on Contracts* § 18:15 (4th ed. 2015).

In this case, there are obvious indications of unfairness. The Loan Agreement called for finance charges of $1,620 for a $200 loan, resulting in a disclosed APR of 838.45%. That level of pricing shocks the conscience. Even defenders of fringe credit have recognized that "[a]t first glance, it would seem irrational for any consumer to borrow money at an interest rate exceeding 400% under any circumstance."[12] Zywicki

---

[11] *Tulowitzki*, 396 A.2d at 961; *see Ryan*, 610 A.2d at 1385 ("[T]he financial aspects of the sale are shocking."); *see also REDUS Peninsula Millsboro, LLC v. Mayer*, 2014 WL 4261988, at *5 (Del. Ch. Aug. 29, 2014) (holding that a complaint stated a claim that a cable television billing arrangement was unconscionable where developer charged a 50% markup on the cost of services).

[12] Edward C. Lawrence & Gregory Elliehausen, *A Comparative Analysis of Payday Loan Customers*, 26 Contemp. Econ. Policy 299, 299 n.1 (2008); *see, e.g.*, JX 49 at PL75 (describing rates of "225% to 300%" as "extraordinary by any measure"); *see also High Interest Loans and Class*, *supra*, at 525 (collecting authorities supporting 36%

conceded that "to a layman in some sense, it just looks kind of shocking to see a price this high."[13] More broadly, Zywicki and his co-authors admit in their recent book that the finance charges for fringe products "are indeed high when expressed in terms of [APR]." *Consumer Credit*, *supra*, at 352. When making this observation, they cited APRs that "often exceed 100 percent." *Id.* The rate for the Disputed Loan was eight times that level.

---

as a benchmark for "responsible and fair small dollar loan frameworks," including jurisdictions that have statutory caps at that level); *Interest Rate Caps*, *supra*, at 120-22 (same); *id.* at 127 (describing survey results finding that approximately 86% of participants believed that rates on fringe products should be capped at an APR of 25% or less); *Public Opinion*, *supra*, at 269-73 (describing surveys showing bipartisan public support for interest rate caps at APRs of 36% or less). In 2006, Congress passed the John Warner National Defense Authorization Act for Fiscal Year 2007, codified at 10 U.S.C. § 987(b), which capped interest rates on payday loans, tax refund loans, and car title loans to military troops at 36%. The federal bill provides secondary evidence suggesting that higher rates are unconscionable and deleterious. *See Public Opinion*, *supra*, at 261-62 (arguing for a federal cap on fringe credit products similar to the military cap); Creola Johnson, *Congress Protected the Troops: Can the New CFPB Protect Civilians from Payday Lending*, 69 Wash. & Lee L. Rev. 649, 650 (2012) (same). Martin contrasts fringe credit products with more typical consumer rates:

> If the likely reader of this law review Article walked into a bank or credit union and asked for a small short-term loan, the person would likely pay an interest rate of 10-18%. . . . A loan from a traditional financial institution, like a bank or credit union, on an unencumbered auto might run such a person anywhere from 5% for a good credit risk up to 21% for a poor credit risk.

*Public Opinion*, *supra*, at 267-68 (footnotes omitted).

[13] Tr. 505 (Zywicki); *accord* Mark Flannery & Katherine Samolyk, *Payday Lending: Do the Costs Justify the Price?* 3 (FDIC Ctr. for Fin. Research, Working Paper No. 2005-09, 2005) ("[T]he maximum fees (per $100 borrowed) imply unusually high APRs on account of the loans' small principal amounts and short maturities. These APRs substantially exceed the rates associated with mainstream consumer credit products, although some mainstream services (e.g., overdraft protection fees or credit card late payment fees) might translate into similar APRs . . . ." (footnote omitted)).

Zywicki recognized that the interest rate on the Disputed Loan was high in other ways as well. He testified that the APRs for unsecured consumer installment loans generally cluster around 150%.[14] Unlike the Disputed Loan, consumer installment loans "are amortized with part of each payment repaying principal so that the loan is paid in full by the last scheduled payment." *Consumer Credit*, *supra*, at 355. The Disputed Loan was a twenty-six period interest-only loan culminating in a balloon payment at the year mark.

The rate charged for the Disputed Loan exceeded even the rates charged for traditional payday loans. Zywicki testified that the industry average for payday loans is a block rate of $15 per $100, half what National charged. Tr. 589-90, 594 (Zywicki). Other sources cite similar figures.[15] The rate for the Disputed Loan also far exceeded what

---

[14] Tr. 588 (Zywicki); *accord* Thomas A. Durkin & Gregory Elliehausen, *Assessing the Price of Short-Term Credit* 14 n.12 (Bd. of Governors of the Fed. Reserve Sys., Div. of Research & Statistics, Working Paper, 2013) (stating that "[i]n the market place, rates and finance charges on installment loans, when available, tend to be lower than the rates in this example [which used an APR of 360%]").

[15] *See Consumer Credit*, *supra*, at 357 (observing that finance charges for payday loans "are typically between $15 and $20 per $100 of the loan amount."); Durkin & Elliehausen, *supra*, at 7 ("Maximum rates for payday loans are commonly between $12 and $20 per $100 borrowed."); Michael A. Stegman & Robert Faris, *Payday Lending: A Business Model that Encourages Chronic Borrowing*, 17 Econ. Dev. Q. 8, 19 (2003) (citing median fee in North Carolina of $36 on a loan of $244); *see also* Borné et al., *supra*, at 5 (citing typical bank payday loan charge as $10 per $100 borrowed and describing it as "very expensive").

Zywicki and his co-authors report as typical rates for other fringe products.[16]

National's efforts to explain the cost of the Disputed Loan were unconvincing. McFeeters would not say what would be an excessive price for a loan. He only would say, "I follow the state laws, and that's what I follow." Tr. at 435 (McFeeters). Delaware does not impose any cap on interest rates, so McFeeters effectively was saying that no price is too high.[17]

Zywicki advanced two types of arguments to explain the price of the Disputed Loan. First, he contended that an APR of 838% could, in theory, result from a competitive market. Second, he argued that there could be situations where it would be rational for a consumer to use a high-interest credit product.

### i. Arguments About Market Pricing

To support his claim about market pricing, Zywicki cited academic studies which have observed that some features of the alternative financial product market are consistent with meaningful price competition, such as low barriers to entry and a large number of stores. Like many aspects of the industry, however, evidence on this issue is

---

[16] *See Consumer Credit*, *supra*, at 354 (typical pawnbroker loan at 161.14%); *id.* at 359 (typical automobile title loan at 300%); *id.* at 360 (typical tax refund loan at 162.43%); *id.* at 367 (typical rent-to-own arrangement involving cost of credit of 145.71%).

[17] In 1981, the General Assembly enacted a statute that allowed out-of-state bank holding companies to establish limited-function state-chartered banks in Delaware. *See* 5 *Del. C* § 802; Dennis S. Aronowitz & Robert Volk, *Developments in Banking Law 1980-81*, 1 Ann. Rev. Banking L. 1, 4-5 (1982). The statute also eliminated usury caps. *See* Aronowitz & Volk, *supra,* at 4-5.

mixed, and other researchers have identified evidence consistent with a variety of strategic pricing practices.[18] Importantly for this case, Zywicki did not conduct any analysis of the Disputed Loan itself, nor did he assess the competitiveness of the Wilmington market. At the same time, he admitted that prices in Wilmington were higher than the ranges he expected. He also recognized that consumers who use fringe products generally lack meaningful alternatives.

In a variant of his market pricing argument, Zywicki contended that the price of the Disputed Loan should not be viewed as excessive unless National was able to generate supra-normal economic profits, which he equated with monopoly rents. Zywicki emphasized one study that has questioned whether payday loan companies generate supra-normal economic profits.[19] The broader evidence is again mixed, with the authors of a study on payday-loan profitability noting that "a recent private analysis for potential investors . . . asserts that a store set up for $30,000 will generate more than $258,000 in operating cash flow over its first five years of operation, which implies an extraordinary average annual pretax rate of return—around 170 percent—on the initial investment."

---

[18] *See, e.g.*, Robert de Young & Ronnie J. Phillips, *Payday Loan Pricing* 27-28 (The Fed. Reserve Bank of Kansas City, Econ. Research Dep't, Working Paper No. 09-07, 2009) (finding evidence of competition in early-stage markets that gives way to evidence of strategic pricing behavior in more mature markets, including the charging of higher prices at stores in largely minority neighborhoods and other markets where demand should be relatively inelastic).

[19] *See* JX 46 at 45 (discussing Aaron Huckstep, *Payday Lending: Do Outrageous Prices Necessarily Mean Outrageous Profits?*, 12 Fordham J. Corp. & Fin. L. 203, 229-30 (2007)).

Flannery & Samolyk, *supra*, at 4 (citation omitted). In their own study, the same authors found that "mature stores appear to earn quite healthy operating profits—on average $18.73 per loan made, or approximately $1.89 per average dollar of loans outstanding." *Id.* at 19. They declined to take a position on whether this level of returns could be described in the abstract as "high" or "reasonable." *Id.* Opponents of fringe products point to other indicators, such as marketing materials from payday loan franchisors that describe high profit levels and the rapid expansion of the industry, which suggests attractive returns.[20] For purposes of this case, Zywicki again did not conduct any analysis specific to Wilmington or National, and he could not offer any opinion as to whether National enjoyed supra-normal profits.

As a third basis for his market-pricing claim, Zywicki posited that high-interest loans are very costly to make, due in part to high default risk. He contended at trial that default rates "are usually in the range of 15, 20, to 25 percent." Tr. 505 (Zywicki). A study by the Pew Charitable Trust found that loan loss rates for payday loans are only 3%. *See How Borrowers Repay*, *supra*, at 6. Zywicki again did not do any analysis specific to this case. He did not analyze default rates in the Wilmington area, nor did he

---

[20] *See* Bianchi, *supra*, at 7-8 (citing rapid industry growth); Flannery & Samolyk, *supra,* at 21 ("Today's payday loan industry does not appear to be in equilibrium."); *Good While Supplies Last*, *supra,* at 564 ("Payday and other short-term loan outlets nearly tripled in number between 1999 and 2006."); *id.* at 8-9 (citing franchisee sales materials from payday lending franchisors and concluding that "[p]ayday lending is a tremendously profitable business"); Stegman & Faris, *supra,* at 10 ("Reliable estimates of the industry's financial status are hard to come by, but various sources suggest that payday lending generates large revenues and is highly profitable.").

examine National's default rates.

Zywicki's opinion that an APR of 838% could, in theory, result from a competitive market was just that—a theoretical possibility. It was not a persuasive response to the facially shocking price of the Disputed Loan.

### ii. Arguments About Hypothetically Rational Uses

Zywicki's second explanation for the price of the Disputed Loan rested on the sensible claim that the price of a consumer product should be assessed, among other things, "by reference to the utility of the loan to the consumer." JX 46 at 43. This approach posits that there can be situations where it is rational and wealth-enhancing for consumers to use high-cost loans. Zywicki touched on these justifications at trial when he explained that consumers can use alternative credit products "to avoid what might kind of be bigger catastrophes like eviction and that sort of thing." Tr. 541 (Zywicki).

In their book on consumer credit, Zywicki and his co-authors offer an expanded version of this argument which asserts that high-interest, small-dollar loans "can facilitate the accumulation of household assets even when they are not used directly to finance the household investment by enhancing overall liquidity, even at high cost." *Consumer Credit*, *supra*, at 369; *accord* Lawrence & Elliehausen, *supra*, at 302. They provide two examples of situations where it could be rational for a consumer to take out a $200 payday loan at a block rate of $15 per $100 (half the rate of the Disputed Loan).

The simplest scenario involves a looming bill, such as a utility payment, where non-payment will trigger a late fee exceeding the finance charge for the loan. Assuming the borrower can repay the loan on schedule, the borrower does better by paying the

33

lower finance charge rather than the higher late fee. A slightly more complex variant involves a late fee that may not exceed the finance charge, but where failing to pay the bill will generate other hardships, such as the loss of electricity for a period of time. Again assuming the borrower can repay the loan on schedule, the borrower does better by paying the finance charge and avoiding the combination of the late fee and the negative consequences. *See Consumer Credit*, *supra*, at 369.

A second and more nuanced scenario posits a borrower who can use the loan proceeds to make a net-present-value-positive choice, such as repairing an automobile immediately instead of delaying the repair while saving the money to pay for it. To construct a viable example, Zywicki and his co-authors assume that until the repair is completed, the consumer will (i) pay fees for public transit and (ii) lose leisure time to commuting, which they value at the consumer's hourly wage. Depending on the assumptions, the model supports scenarios where it makes sense for the consumer to use a payday loan with a nominally high APR of 309% to repair the car sooner rather than later. *See id.* at 370-72.

In each of these cases, the viability of using high-cost credit rationally depends on the consumer having a use for the funds which generates monetary and non-monetary returns that exceed the price of the loan. To their credit, the authors recognize that the ability of a consumer to overcome a high APR (309% in their model) depends largely on "the very short term to maturity" for a single-period payday loan. *Id.* at 371. They observe that "[t]his would not be the case for a long-term loan," and that "[e]xtended use of this sort of credit is where it becomes most highly controversial." *Id.* at 372.

And there's the rub. The Disputed Loan was not structured as a short-term loan. It was a twelve-month, interest-only installment loan. The Disputed Loan also charged an interest rate that was more than double what Zywicki and his co-authors modeled (838% vs. 309%). Zywicki did not identify any scenarios in which it could be rational for a consumer to borrow on the terms contemplated by the Disputed Loan.

Perhaps anticipating this disconnect, Zywicki attempted at trial to re-characterize the Disputed Loan as a short-term loan by pointing out that James had the option to prepay. The decision to prepay parallels the decision to pay a traditional payday loan on time. Consumer groups have modeled the likelihood that a typical user of high-cost credit will repay a traditional payday loan in a single period and avoid a cycle of long-term indebtedness. The Center for Responsible Lending provides the example of a borrower making $35,000 per year who obtains a payday loan for $200 plus a finance charge of $20. Assuming average levels of consumer expenditures for food, housing, utilities, transportation, healthcare, and other essentials, and excluding costs such as childcare and clothing, the borrower finishes the next pay period with a $96 deficit, forcing a loan rollover. *See* Borné et al., *supra*, at 8-9. The same report examines how a payday loan affects the account balance of a typical borrower on a fixed income, such as social security. It demonstrates that although the loan temporarily boosts the customer's bank balance, the combination of the balloon payment and fees makes the borrower worse off

and necessitates another loan.[21] A report by the Pew Charitable Trust concludes that

> the lump-sum repayment model appears to make it difficult for borrowers to avoid renewal. Pew's analysis of state and industry data indicates that borrowers are indebted for an average of about five months of the year. According to one study, 76 percent of these loans, including renewals, are borrowed within two weeks following an existing payday loan's due date, meaning the borrower could not pay back the loan and make it to the next payday without another loan. In addition, Pew's analysis of data from Oklahoma finds that more borrowers use at least 17 loans in a year than use just one.

*Who Borrows*, *supra*, at 7 (footnotes omitted). A follow-up study found that "[o]nly 14 percent of borrowers can afford enough of their monthly budgets to repay an average payday loan," although most could afford to pay the interest-only fee to roll over the loan. *How Borrowers Repay*, *supra*, at 6. The study observed that "[a]verage borrowers end up indebted for five months, paying $520 in finance charges for loans averaging $375."[22]

It may be that a consumer with the wherewithal to repay a high-cost loan after one period could rationally use some high-cost products in a wealth-enhancing way, but that thought experiment does not persuasively justify the pricing and terms of the Disputed Loan. The loan James obtained was a twenty-six period, interest-only loan followed by a

---

[21] *See id.* at 10-11; *accord* King & Parish, *supra*, at 8 (similar example using 2005 data).

[22] *Id.* at 4; *see Good While Supplies Last*, *supra*, at 577 ("Given the demographics of the payday loan customers in this study and the typical expenses of people within this demographic, coupled with the loan design, very few customers can afford to pay back the loans.")

twenty-seventh period balloon payment at an APR of 838%. As noted, Zywicki and his co-authors recognize that it is difficult to imagine a situation where it would make sense for a consumer to use a multi-period loan at the interest rates charged for payday loans. *See Consumer Credit*, *supra*, at 370-72. Zywicki's testimony about the hypothetically rational use of some high-cost credit products failed to legitimize the Disputed Loan's facially disturbing price.

### iii. Fundamental Unfairness

The economic terms of the Disputed Loan are so extreme as to suggest fundamental unfairness. The price of the Disputed Loan is particularly egregious given its multi-period, non-amortizing structure. The finance charges incurred over the course of the loan are so high that no rational borrower would agree to pay them, unless under duress or operating under a misapprehension of fact. The first *Fritz* factor is satisfied.

### b. Contract Provisions Suggesting Unfairness

The next four *Fritz* factors focus on contract provisions that can contribute to a finding of unfairness. They include provisions that deny or waive "basic rights and remedies," "penalty clauses," and "disadvantageous" clauses that are hidden or difficult to identify and understand. 1990 WL 186448, at *4. The more general question is whether the contract provisions evidence "[a]n overall imbalance in the obligations and rights imposed by the bargain." *Id.* at *5. Specific provisions might not be unconscionable in isolation or under different circumstances, yet still may contribute to a

finding of unconscionability in a given case.[23]

The Loan Agreement contains provisions that raise concerns, but they are not sufficiently onerous to support a finding of unconscionability standing alone. They contribute to the overall assessment of the Loan Agreement, but as a secondary factor.

One category of provisions called out in *Fritz* encompasses waivers and denials of basic rights and remedies that a consumer otherwise would possess. The Loan Agreement included a waiver of the right to a jury trial, which extended to "any dispute you may have against us or a related third party." JX 19 at 3. It did not define what it meant by "related third party." The Loan Agreement also contained an arbitration provision in which the borrower gave up the right to sue in court (other than in small claims court) and the right to arbitrate on a class-wide basis. The Loan Agreement did give James sixty calendar days to opt out of the arbitration provision, and it contained some procedural features to make arbitration less onerous. Had James moved forward with arbitration, her greatest disadvantage would have been limited discovery. As shown by National's

---

[23] *See, e.g.*, *Trethewey v. Basement Waterproofing Nationwide, Inc.*, 1994 WL 680072, at *4 (Del. Ch. Oct. 19, 1994) (recognizing that a waiver of consequential damages can be valid, but finding a limitation of liability for consequential damages was unconscionable on the facts of the case); *Architectural Cabinets, Inc. v. Gaster*, 291 A.2d 298, 30 (Del. Super. 1971) (recognizing that "confession of judgment clauses are not in themselves unconscionable" but holding it was unconscionable on the facts presented); *see also Consumer Credit*, *supra*, at 410 ("[P]ossible loan terms, such as prepayment penalties, balloon payments, or loans based on collateral rather than the ability to repay, may be perfectly fine for borrowers who understand their uses and how agreeing to such terms may be useful in bargaining for more favorable interest rates or other terms. But the same terms . . . not understood fully by unsophisticated borrowers may be predatory in both intent and effect.").

conduct in this case, it took a determined attorney with the benefit of court-ordered discovery to obtain responsive information from National, and even then National did not produce all of its responsive information.

The jury waiver and the arbitration provision fall within the meaning of the *Fritz* factor that focuses on waivers of rights and remedies, but they do not contribute meaningfully to a finding of unconscionability. The same is true for penalty clauses, which is another category of provisions that *Fritz* identifies. 1990 WL 186448, at *4. The Loan Agreement contemplates a late fee "on any installment not paid in full within 5 days after its due date as originally scheduled, in the amount of 5% of the unpaid amount of the delinquent balance." JX 19 at 3. A 5% late fee is authorized by statute. *See* 5 *Del. C.* § 2231(2). The Loan Agreement also gives National the right to declare a default after a missed payment and to cause all outstanding amounts to accelerate, and it obligates the borrower "to pay the actual expenditures, including reasonable attorneys' fees, for legal process or proceedings to collect the amounts owing hereunder." JX 19 at 3-4. This type of attorneys' fee provision is also permitted by statute. *See* 5 *Del. C.* § 2236. As with the discussion of waivers of rights and remedies, these provisions satisfy the *Fritz* factor that focuses on penalty clauses, but they do not contribute meaningfully to a finding of unconscionability.

The *Fritz* decision also calls for consideration of "disadvantageous" clauses that are "inconspicuous," as well as "language that is incomprehensible to a layman" or seems designed to "divert his attention from the problems raised by them or the rights given up through them." 1990 WL 186448, at *4. Two aspects of the Loan Agreement warrant

39

mention.

The first involves the provisions addressing ACH withdrawals. Comprising fifteen single-spaced paragraphs and subparagraphs, and written in what appears to be eight-point font, the provisions span a full page of the six-page agreement. These provisions are highly favorable to National, but the Loan Agreement portrays them as beneficial to the consumer. At one point, it states that "**THIS ACH AUTHORIZATION IS FOR YOUR CONVENIENCE IN PAYING AMOUNTS OWED AND RECEIVING THE LOAN PROCEEDS.**" JX 19 at 3. Elsewhere the Loan Agreement states, "For your protection, this form authorizes Loan Till Payday to automatically collect each periodic payment due under the terms of this Contract." *Id.* at 6. The provisions are actually a form of security interest that is for National's protection and convenience.

The provisions governing ACH withdrawals are confusing because they speak of making "ACH" transfers from "the checking or savings account specified in your Application/Data Verification form ('Your Bank Account')." *Id.* at 2. National, however, treats the authorization as covering debits from a pre-paid debit card like James' Nexis card, and National repeatedly debited James' account. Further complicating matters, the signature page where the borrower specifically authorizes the withdrawals appears under the heading "Credit Card Authorization." *Id.* at 6. Despite this language, National does not accept credit cards, and James did not have a credit card; she had a debit card.

The inconsistent language in the Loan Agreement could easily confuse an unsophisticated customer like James. The difficulties with National's language had particular salience for this case, because when James obtained the Disputed Loan, she

told Reilly that she did not want electronic withdrawals made from her account. Reilly made two notes in the Payday Loan Manager. One stated "No ACH debits," and another stated, "Customer wants to walk in cash payments." JX 29B at 659. Yet National debited James' Nexis card and made at least one ACH withdrawal from her Nexis account.

James' instruction and National's acknowledgement catches National on the horns of a dilemma. To the extent that National's witnesses took a narrow and legalistic view at trial by arguing that James only opted out of ACH withdrawals and not debits from her Nexis card, then the same logic meant that James only granted "Credit Card Authorization," not debit card authorization. To the extent that National's witnesses argued broadly at trial that the "Credit Card Authorization" encompassed all types of electronic withdrawals, then James' insistence that she did not want ACH withdrawals should have been sufficient to opt out. In neither case did National get the authorization it needed to debit James' account.

The debate over whether James validly opted out of ACH transfers identifies a second problem with the ACH provisions: they make it extremely difficult for a customer to avoid granting National the authorization it wants. In the fourteenth of fifteen paragraphs and subparagraphs addressing ACH transfers, the Loan Agreement does say that the ACH authorization is optional, but the borrower can opt out only "**BY MANUALLY CROSSING OUT ALL ACH AUTHORIZATION LANGUAGE IN THIS AGREEMENT.**" JX 19 at 3. The formal authorization then comes three pages later, under the heading "Credit Card Authorization," in a paragraph that makes no reference to ACH debits and does not contain the abbreviation "ACH." *See id.* at 6. There

is nothing to alert customers to the fact that by signing the language under the heading "Credit Card Authorization," they are agreeing to ACH transfers.

Once a customer has authorized ACH transfers, it is difficult to terminate them. According to the Loan Agreement,

> You may terminate one or all of the authorizations to initiate ACHs from Your Bank Account set forth above by calling us at 302-328-1370 **and** by writing us at 1511 North DuPont Highway, New Castle, DE 19720 **and** specifying which authorizations you would like to terminate. We will discontinue initiating any ACHs you specify as soon as we reasonably can and in any event within three business days after receiving your termination request.
>
> . . . .
>
> This ACH Authorization will remain in full force and effect until (i) we have received written notification from you of its termination in such time and in such manner as to afford us and the Depository a reasonable opportunity to act on it or (ii) upon full and final payment of the amount you owe us under this Agreement.

*Id.* at 3 (emphasis added). McFeeters testified that he would insist on full compliance with the language of the contract before terminating an ACH authorization, meaning that a customer only could terminate ACH withdrawals by calling the phone number and confirming in writing.

The Loan Agreement skews the ACH withdrawal provisions in National's favor in another way as well: National can withdraw whatever amount it wants from a customer's account, up to the full amount of the outstanding loan plus fees and charges, without prior notice to the customer that a higher amount will be debited. The operative language states:

42

Please note that you have the right to receive notice of all transfers varying in amount, and that by signing this ACH Authorization you acknowledge that we have elected to offer you a specified range of amounts for debiting (in lieu of providing the notice of transfers in varying in amount [sic]). The amount of any ACH debit will range from (i) the payment amount provided in the payment schedule (which may be less than a scheduled payment if partial prepayments have been made), to (ii) an amount equal to the total outstanding balance (which may be greater than or less than a payment based upon your actual payments), plus as applicable, any returned payment charges and/or any late charges you may owe under the Agreement. For any debit outside of this specified range, we will send you a notice. Therefore, by agreeing to the terms of this ACH Authorization you are choosing to only receive notice when a transfer amount exceeds the range specified above.

JX 19 at 3. National relied on this paragraph to debit James' account for amounts greater than her scheduled payment, without prior notice to James. For National's cash-constrained customers, a higher withdrawal easily could overdraw their account or sweep up the bulk of their available cash.

In my view, the provisions governing ACH withdrawals are "disadvantageous," drafted in "language that is incomprehensible to a layman," and appear designed to "divert [the customer's] attention from the problems raised by them or the rights given up through them." *Fritz*, 1990 WL 186448, at *4. As drafted and implemented, the ACH provisions support a finding of unconscionability.

The same is true for the provisions governing rescission and prepayment, which the Loan Agreement combines confusingly in a single paragraph. The Delaware Code addresses these concepts separately. One statutory section addresses prepayment. *See* 5 *Del. C.* § 2234. A separate statutory section requires a right of rescission. *See id.* § 2235A(a)(3). The Loan Agreement, by contrast, shoves the right of rescission into the

43

middle of six sentences addressing prepayment. The paragraph in question states:

> You shall have the right to make payment in advance and in any amount on this Loan Agreement at any time. You will not incur an additional charge, fee or penalty for prepayment. Prepayments of principal may reduce the total amount of interest you are scheduled to pay under this Loan Agreement. *To rescind future payment obligations under this Loan Agreement and receive a refund of the finance charge, you must (i) inform us by visiting a store of your intent to rescind no later than 4:00 PM Eastern Time on the next business day immediately following the Disbursement Date ("Rescission Deadline"), and (ii) give us written authorization to effect a debit entry to Your Bank Account, defined in the Repayment Authorization below, for the principal amount of the loan. If we receive payment of the principal amount of the loan via such authorization, then we will refund the interest owing and rescind the future payment obligations under this Loan Agreement.* Thereafter, if you prepay this Loan Agreement in full or in part, no earned interest will be refunded. To process a partial or full prepayment or receive a payoff balance, you should call us (302-328-1370) or visit a store of your intent to prepay. Please note that the payoff amount will be calculated as of the date we debit Your Bank Account for the balance owing.

JX 19 at 2 (emphasis added). As structured, the first three sentences address prepayment, including the customer's right to prepay any amount at any time. The italicized portion shifts to the customer the right to rescind the loan agreement within the first twenty-four hours after obtaining the loan. The last three sentences return to the concept of prepayment.

In my view, this is another provision that is "disadvantageous," drafted in "language that is incomprehensible to a layman," and designed to "divert [the customer's] attention from the problems raised . . . or the rights given up." *Fritz*, 1990 WL 186448, at *4. As drafted and implemented, it supports a finding of unconscionability.

National argues that because James did not read the Loan Agreement, none of its

44

terms should matter in the unconscionability analysis. When a business relies on a contract of adhesion, a court does not take into account whether the consumer has read the document: "Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, *without regard to their knowledge or understanding of the standard terms of the writing*." Restatement (Second) of Contracts § 211(2) (emphasis added). "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it." *Id.* § 211, cmt. e. This approach rests on the rationale that

> [a] party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms. One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms. Employees regularly using a form often have only a limited understanding of its terms and limited authority to vary them. Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose.

*Id.*, § 211 cmt. b.

The final factor relating to the contract terms is whether the agreement evidences "[a]n overall imbalance in the obligations and rights imposed by the bargain." *Fritz*, 1990 WL 186448, at *5. Some insight into this factor can be gleaned from the degree to which the Loan Agreement devoted attention to particular subjects.

The Loan Agreement covered six pages. Five contained substantive provisions. The sixth was a signature page. Of the five substantive pages, one full page of text

45

(spanning most of page one and part of page two) created the most significant imbalance in the agreement: the financial terms. In return for a loan of $200, James agreed to repay National $1,820, structured as twenty-six non-amortizing, interest-only payments of $60 followed by a balloon payment of $260. Another full page (spanning part of page two and most of page three) detailed National's ability to make ACH withdrawals. A page and a half (spanning the bulk of page four and the bulk of page five) addressed the arbitration provision.

In total, the Loan Agreement devoted nearly two-thirds of its contents to these three subjects, evidencing their importance to National. Through these provisions, National imposed onerous financial terms and gave itself the right to collect unilaterally from James any amount it wished, up to the full amount of the loan plus fees and charges. National ensured that in any challenge to the Disputed Loan, James would not be able to represent a class. She would have to challenge National alone, based on a loan where the amount in question would make the representation economically irrational for a lawyer unless he could recover his fees from National. Moreover, unless James opted out of the arbitration provision within sixty days—something that no customer other than James has ever done—then James would have to challenge the Disputed Loan in arbitration, which was National's chosen forum. Taken as a whole, for purposes of the *Fritz* factors, the Loan Agreement evidences "[a]n overall imbalance in the obligations and rights imposed by the bargain." *Id.*

### 2. Factors Relating To Procedural Unconscionability

The next four *Fritz* factors shed light on the concept of procedural

unconscionability. They are:

- Inequality of bargaining or economic power.

- Exploitation of the underprivileged, unsophisticated, uneducated, and illiterate.

- The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position.

- The circumstances surrounding the execution of the contract, including its commercial setting, its purpose, and actual effect.

As I see it, these factors help a court test the degree to which a seemingly disproportionate outcome could have resulted from legitimate, arms'-length bargaining. The first and second factors plumb this issue by considering the extent to which the parties to the agreement were capable of bargaining at arms'-length. A court rarely will intervene when the contracting parties are both commercial entities or otherwise sophisticated. By contrast, a court may be more concerned where the contracting process involved significant inequalities of bargaining power, economic power, or sophistication, particularly between a business and a consumer. An aggravated version of this scenario arises when one of the parties is an individual who is underprivileged, uneducated, or illiterate.

The third and fourth factors similarly contribute by examining the degree to which actual bargaining took place. The third factor considers whether the agreement is a contract of adhesion. The fourth factor takes into account the contracting environment, including the commercial setting and the purpose and effect of the disputed agreement.

Together, these factors weigh an initial showing of unfairness against the

47

bargaining dynamic. If the contract resulted from legitimate negotiation, then a court should not intervene. "There is a significant distinction between an unconscionable contract and a bad bargain." *Obaitan v. State Farm*, 1997 WL 208959, at \*3 (Del. Ch. Apr. 17, 1997). "Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). But if the contract appears fundamentally unfair and there are valid reasons to suspect that the outcome did not result from legitimate negotiation, then a different picture emerges.

### a.     The Attributes Of The Parties

The first two factors that fall under the heading of procedural unconscionability examine the relative attributes of the parties and whether they were capable of bargaining. The first of the two factors examines whether there is an "inequality of bargaining or economic power." *Fritz*, 1990 WL 186448, at \*5. The second considers whether the contract involved "exploitation of the underprivileged, unsophisticated, uneducated and the illiterate." *Id.* To my mind, the second is an aggravated version of the first.

These factors do not mean that the law censures every power imbalance. To the contrary, "[a] bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party." Restatement (Second) of Contracts § 208, cmt. d. After all, "bargaining power will rarely be equal." *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at \*11 (Del. Ch. July 9, 2002) (Strine, V.C.) (quoting *Farnsworth on Contracts* § 4.28 (2d ed. 2000)). Consequently, a "mere disparity

between the bargaining power of parties to a contract will not support a finding of unconscionability." *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989); *accord Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978) ("Superior bargaining power alone without the element of unreasonableness does not permit a finding of unconscionability or unfairness.").

"But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, . . . may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." Restatement (Second) of Contracts § 208, cmt. d. The inequality must be sufficiently great such that one side is placed at a meaningful disadvantage, and the court must find as part of its overall analysis that the stronger party used its position "to take unfair advantage of his weaker counterpart." *Graham*, 565 A.2d at 912.

This approach manifests itself in a judicial reluctance to invalidate contracts between business entities or other sophisticated parties. For example, Delaware courts are "particularly reluctant to find unconscionability in contracts between sophisticated corporations." *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119, 2014 WL 823407, at *9 (Del. Feb. 28, 2014) (ORDER). By contrast, courts are more willing to step in when a contract involves a business and a consumer.[24] Delaware decisions also exhibit

---

[24] *See, e.g.*, *Trethewey*, 1994 WL 680072, at *4 (stressing that the contractual provision found to be unconscionable arose in "a situation where a business was dealing with a homeowner"); *see also REDUS Peninsula*, 2014 WL 4261988, at *5 (finding complaint stated claim that arrangement between developer and homeowners was

sensitivity to situations in which a sophisticated actor has taken advantage of someone who is underprivileged, unsophisticated, uneducated, or illiterate. In the *Ryan* decision, for example, Chancellor Allen recognized that a constellation of attributes such as poverty, financial distress, and lack of sophistication can make an individual vulnerable. *Ryan v. Weiner*, 610 A.2d 1377, 1385 (Del. Ch. 1992) (Allen, C.). He noted that although these disadvantages do not prevent a person from making a valid contract, they are factors that a court can take into account. *See id.*

The Disputed Loan was a contract between a business and a consumer. It therefore falls within the category of contracts where courts are relatively more likely to invoke the unconscionability doctrine.

More importantly, the Loan Agreement was a contract between (i) a specialized business addressing a target market of underprivileged, cash-constrained, and credit-rationed consumers, and (ii) an unsophisticated member of the target market. The Disputed Loan thus raises concerns about predatory lending.[25] Indeed, the experts and the

---

unconscionable). *See generally* 8 *Williston on Contracts* § 18:8 ("The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power. It is for this reason as much as any other that unconscionability is not as commonly found in contracts between business persons as when consumers or other less sophisticated parties are involved." (quotation marks and citation omitted)).

[25] *Cf. Consumer Credit*, *supra*, at 410 ("Most observers and commentators contend that subprime lending is a necessary but not sufficient condition for predatory lending. Thus, to most observers, not all subprime lending is predatory, but most or all predatory lending is subprime.").

supporting literature on alternative financial services find rare agreement on two points.

First, the consumers who use the products tend to be cash-constrained and credit-rationed, meaning that they have limited resources and few, if any, credit alternatives.[26]

Second, consumers typically use high-interest financial products for necessities, such as

---

[26] *See, e.g.*, Tr. 541 (Zywicki describing users of fringe products as "basically being credit rationed"); *id.* at 617 (same); JX 46 at 34 ("[T]hose who use alternative lending products . . . tend to be more 'credit constrained' than those who use more mainstream products . . . ."); *id.* at 47 ("Those who use short-term loans such as small-dollar installment loans often, but not always, have impaired credit, which restricts their access to mainstream credit products."); *id.* at 48 ("[T]hose who use payday loans generally either do not have access to preferred types of credit such as credit cards or would trigger expensive fees from credit card use . . . ."); *id.* at 50 ("[F]ew who would otherwise use payday loans can switch to less-expensive alternatives . . . ."); Neil Bhutta, Paige Marta Skiba & Jeremy Tobacman, *Payday Loan Choices and Consequences* 10-11 (Vand. U. Law & Econ., Working Paper No. 12-30, 2012) (finding that payday loan customers are more likely than the general population to be delinquent on credit accounts and were generally unsuccessful in obtaining credit other than through alternative credit products); Flannery & Samolyk, *supra,* at 6 ("[I]ndividuals with impaired credit histories are more likely to use payday loan[s] as a source of funds."); *High Interest Loans and Class*, *supra*, at 526-27 (citing authorities charging that providers of fringe products prey on racial and ethnic minority groups and target the poor); Lawrence & Elliehausen, *supra*, at 310 (finding that only half of payday loan customers have a general purpose bank credit card and over 60% reported refraining from using the card within the previous year to avoid exceeding their credit limit); Rob Levy & Joshua Sledge, Ctr. for Fin. Servs. Innovation, *A Complex Portrait: An Examination of Small-Dollar Credit Consumers* 15-16 (2012) (finding that over half of those who used alternative credit products did not qualify for a credit card, had "maxed out" their credit, or could no longer use credit cards); *id.* at 14 (finding that 66% of consumers who used fringe products had no savings and 16% could not pay their bills); Stegman & Faris, *supra*, at 14 ("[T]here is widespread agreement that most payday loan customers are credit constrained."); *see also Who Borrows*, *supra,* at 4 ("[A]fter controlling for other characteristics, there are five groups that have higher odds of having used a payday loan: those without a four-year college degree; home renters; African Americans; those earning before $40,000 annually; and those who are separated or divorced.").

food, rent, utility bills, and mortgage payments,[27] meaning that they face an urgent need for funds.[28] Defenders and critics of high-interest products differ only in how they spin these facts. Defenders view fringe products as virtuous because they provide a form of credit, albeit at high cost, to consumers who otherwise would not have any. Critics charge that high-interest lenders take advantage of people in economic duress.

---

[27] *See, e.g.*, Tr. 538-39 (Zywicki) ("People who use small-dollar loans are people who tend to live pretty close to the margin. And the literature finds that, you know, roughly two-thirds use it for things like food—I'm sorry. Rent and groceries. . . . [W]e're talking about people who live on the edge, live on the margin."); Durkin & Elliehausen, *supra*, at 18 (reporting on survey data from a series of surveys facilitated by an industry trade association which indicate that "payday loans are generally used to address urgent needs"); *Good While Supplies Last, supra*, at 609 (reporting on survey data indicating that many customers use loans to cover regular bills); Levy & Sledge, *supra*, at 4 (finding that consumers typically use high-interest lending products to meet important financial obligations, such as rent, utility bills, and mortgage payments); *Who Borrows*, *supra*, at 4-5 ("[S]urvey respondents from across the demographic spectrum clearly indicate that they are using the loans to deal with regular, ongoing living expenses. . . . 69 percent used [a first-time payday loan] to cover a recurring expense, such as utilities, credit card bills, rent or mortgage payments, or food."); Jonathan Zinman, *Restricting Consumer Credit Access: Household Survey Evidence on Effects Around the Oregon Rate Cap* 9 (Fed. Reserve Bank of Phila., Working Paper No. 08-32, 2008) (finding payday loan customers primarily use proceeds for bills, emergencies, food, and debt service).

[28] *Consumer Credit*, *supra*, at 381 ("In sum, most customers used small consumer finance loans because they had an urgent need and did not have better alternatives."); *id.* at 380 ("[M]ost customers faced an urgent need for funds . . . ."); *id.* at 383 ("Most customers used payday loans because they had an urgent need and had few alternatives."); *How Borrowers Repay*, *supra*, at 9-10, 21 (noting that 58% of payday loan customers reported having trouble paying their bills more than half of the time and 37% said they were so desperate to pay their bills that they would take a payday loan on any terms offered).

### i. National

National specializes in providing high interest loans to underprivileged consumers who are cash-constrained and lack alternative sources of credit. When McFeeters acquired National, he applied to have National's banking licenses renewed. *See* JX 4 (the "Licensing Application"). National disclosed in its Licensing Application that many of its customers "have had credit problems in the past or have reached the maximum limit on their bank cards." *Id.* at 510; *see* Tr. 371-72 (McFeeters).

National is a well-funded operation. The Licensing Application projected that National's business model would generate free cash flow of $1.5 million to $2 million per year. Its actual performance has been on the order of $1 million per year.

National's owner and its personnel are sophisticated and knowledgeable. McFeeters acquired National after working in the payday loan industry for approximately ten years. In 2013, National had fourteen stores throughout Delaware, which it ran using a centralized model. At trial, National maintained that it had a manual setting out its policies and procedures. Tracey Annand, a District Manager at National, trained all of National's personnel. National employed legal counsel to draft its loan agreements.

National's employees recognize that its customers have difficulty predicting how long their loans will be outstanding and virtually never estimate correctly when they will be able to repay their loans. Customers who believe they will have a loan outstanding typically end up keeping the loan for "a couple months." *See* Tr. 341 (Carter).

### ii. James

James is unsophisticated and undereducated. She dropped out of school in the

tenth grade, then obtained her GED approximately ten years later. She tried to improve her skills through a nine-month course on medical billing and coding, but she stopped two months short of graduation. Evidencing her lack of financial sophistication, she believed that the financial aid she received for the program was a grant. It was actually a loan that she struggled to pay back.

Further evidence of James' lack of financial sophistication comes from her testimony about why she uses a pre-paid Nexis card. At trial, James explained that she previously had a checking account with PNC Bank but switched to her Nexis card because she did not like paying a monthly fee to maintain the checking account. Before making the Disputed Loan, National obtained a sixty-day transaction history for the Nexis account. It shows that during that period, James paid Nexis a total of $127.07 in transaction fees. Each time the Hotel DuPont paid James by direct deposit, Nexis charged her a load fee equal to 2% of the direct deposit amount. The load fees totaled $44.07. Each time James used her card to pay for a transaction and authorized it with her signature, Nexis charged her a signature transaction fee of $1. She signed for twelve transactions for total signature fees of $12. Each time James used her card to pay for a transaction and authorized it with her pin number, Nexis charged her a PIN transaction fee of $1.50. She completed thirteen PIN transactions for total PIN fees of $19.50. Each time, James attempted a transaction and her card was declined, Nexis charged her a decline fee of $0.50. Her card was declined fourteen times for total decline fees of $7. Each time she withdrew cash, Nexis charged her an ATM usage fee of $2.50. She withdrew cash on twenty-one occasions for total fees of $52.50. The amounts of the cash

withdrawals suggest that the ATM provider also charged a withdrawal fee that was incorporated into the amount of the debit.

James does not appear to have comprehended the magnitude of the per-transaction fees that Nexis charged her, or the reality that those fees far exceeded the flat monthly fee that a bank would charge for a no-minimum-balance checking account, particularly where the client had direct deposit. She seems only to have considered the headline fee charged for the account each month.

James' perception of the financial charge for the Disputed Loan reflected a similar short-term focus. National contended James understood the block rate she would pay, which was $30 on $100. It is true that James could recite the block rate, but that does not mean she understood its implications. To the contrary, the evidence convinced me that National used a block rate and de-emphasized the APR to mislead its customers and make them think their cost of credit was an order of magnitude lower than it really was. James did not understand how interest accrued, and she did not understand what would happen upon default.

James underestimated her likelihood of repaying the Disputed Loan quickly. She thought she could pay it off in two payments, but she failed to do so. She similarly mis-remembered her success in repaying previous loans. She thought she paid off each of her previous loans in one or two payments, but for the previous loans from National (the only loans in the record), James took longer. For the loan immediately preceding the Disputed Loan, there were seven attempted payments, four of which were declined.

James is also underprivileged. In 2013, she took home approximately $1,100 per

month, and her annualized income of approximately $13,200 represented 115% of the federal poverty line for a single-person household. She lived paycheck to paycheck and had no savings to fall back on. She did not have access to alternative sources of credit. By 2013, when James took out the Disputed Loan, she had been using high-interest, unsecured loans for four to five years, perhaps longer. She did not use the loans in response to unforeseen emergencies. She used them on a relatively regular basis for essential needs. She obtained the Disputed Loan because she needed money for groceries and rent. James' frequent use of high-cost loans was a detriment and should have been a red flag to National.

At trial, National tried to turn James' weakness into a strength, arguing that she was an experienced consumer who was competent to use high-interest financial products. Zywicki stressed this point, contending that James' prior use of similar loans "suggest[ed] that she was familiar with the material terms of the loan, understood the risks, and the like." Tr. 509 (Zywicki); *see id.* at 523-24, 549-50. In contrast to National's arguments at trial, both defenders and critics of payday loans generally agree that frequent use is problematic. [29]

---

[29] *See, e.g.*, Oren Bar-Gill & Elizabeth Warren, *Making Credit Safer*, 157 U. Pa. L. Rev. 1, 44 (2008) ("The problem lies with the substantial subset of consumers who take out multiple [payday loan] advances and pay the $30 fee many times over."); Durkin & Elliehausen, *supra*, at 21 ("Most customers with a large number of loans had intervals between borrowings, but some had payday loan sequences lasting 14 weeks or longer. . . . Such frequent payday loan use undoubtedly did not help some borrowers to manage their finances, however; and it may well have exacerbated the difficulties of others."); *id.* at 21 n.18 ("Factors associated with difficult in managing finances such as not saving,

Given the relative attributes of National and James, the Disputed Loan involved both "inequality of bargaining or economic power" and the "exploitation of the underprivileged, unsophisticated, [and] uneducated." *Fritz*, 1990 WL 186448, at *5. These factors favor a finding of unconscionability.

### b. A Take-It-Or-Leave-It, One-Sided Form Agreement

The next *Fritz* factor asks directly whether there was actual bargaining involved. As framed in *Fritz*, the court should consider "[t]he use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position." *Id.* at *4. The type of standardized contract that this factor describes is also called a contract of adhesion. *See Worldwide Ins. Gp. v. Klopp*, 603 A.2d 788, 790 (Del. 1992); *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989).

"[A] contract of adhesion is not unconscionable per se, and . . . all unconscionable contracts are not contracts of adhesion." Restatement (Second) of Contracts § 208,

---

relatively heavy credit card indebtedness, and overdrawing checking accounts are associated with frequent use of payday loans."); Flannery & Samolyk, *supra,* at 21 ("For many observers, the main consumer concern about payday lending is the high price of chronic use."); Lawrence & Elliehausen, *supra*, at 313 (finding that "frequent users have long-term difficulty in managing finances and their less favorable attitudes toward credit reflect difficulties in handling credit"); *id.* at 315 ("[R]eliance on payday loans for an extended period of time . . . may exacerbate rather than relieve financial problems some consumers face."). *See generally* JX 49 at PL87-89, 90-92 (collecting empirical studies supporting the proposition that consumers who borrow at high rates that are nevertheless below what National charged on the Disputed Loan generally end up in a cycle of increasing debt that culminates in default).

Reporter's Note, cmt a. Contracts of adhesion provide many benefits:

> Standardization of agreements serves many of the same functions as standardization of goods and services; both are essential to a system of mass production and distribution. Scarce and costly time and skill can be devoted to a class of transactions rather than to details of individual transactions. Legal rules which would apply in the absence of agreement can be shaped to fit the particular type of transaction, and extra copies of the form can be used for purposes such as record-keeping, coordination and supervision. . . . Operations are simplified and costs reduced, to the advantage of all concerned.

*Id.* § 211, cmt. a.

> But standardized agreements also carry a heightened risk of unfair terms:

> Standardized agreements are commonly prepared by one party. The customer assents to a few terms, typically inserted in blanks on the printed form, and gives blanket assent to the type of transaction embodied in the standard form. He is commonly not represented in the drafting, and the draftsman may be tempted to overdraw in the interest of his employer.

*Id.*, § 211, cmt. c. This dynamic creates an "obvious danger of overreaching." *Id.* "The weaker party, in need of the good or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses." 8 *Williston on Contracts* § 18:13 (quoting *Weaver v. Am. Oil Co.*, 276 N.E.2d 144, 147 (Ind. 1971)).

All else equal, the fact that an agreement is a contract of adhesion makes it relatively more likely that the agreement will be found unconscionable. Like the other *Fritz* factors, the fact that an agreement is a contract of adhesion is not sufficient, standing alone, to render an agreement unconscionable.

The Loan Agreement is a contract of adhesion. It was form agreement, drafted by National, and provided to James on a take-it-or-leave-it basis. James had no ability to

negotiate the terms of the Loan Agreement. Other than to rely on the truism that a standard form agreement is not inherently unconscionable, National does not dispute this factor. National's position is correct, but this factor nevertheless favors a finding of unconscionability.

### c. The Bargaining Environment

The final *Fritz* factor considers the "[t]he circumstances surrounding the execution of the contract." 1990 WL 186448, at *4. One pertinent attribute is the commercial setting. *Id.* Another is whether a party confronts "an absence of meaningful choice." *Ketler v. PFPA, LLC*, --- A.3d ---, 2016 WL 192599, at *2 (Del. Jan. 15, 2016) (quotation marks omitted). A third is the "purpose and actual effect" of the agreement. *Fritz*, 1990 WL 186448, at *4; *see* 6 *Del. C.* § 2-302(2) (instructing a court to consider "the purpose and effect" of the contract when evaluating unconscionability). For the Disputed Loan, that necessarily takes into account its relationship to the Payday Loan Law.

### i. The Commercial Setting

James obtained the Disputed Loan from a small, store-front office. She was given the documents and told where to sign. Reilly's main role was to try to induce her to take out twice the loan amount she wanted ($400 instead of $200). Those were not ideal conditions, but they were not inherently oppressive. They are consistent with a standardized financial transaction accomplished through a contract of adhesion.

A more problematic issue is that National's employees denigrate the importance of the APR while describing the interest rate in simplistic ways that are designed to mislead customers. For example, National takes the position that the APR "has nothing to do with

59

the loan." Tr. 335 (Carter). National's employees suggest to borrowers that that the APR is "irrelevant" unless the loan remains outstanding for an entire year. Tr. 337 (Carter). If a customer only plans to keep the loan outstanding for a few weeks, then National's employees discount the APR as "meaning[less]." Tr. 337-38 (Carter).

Instead of focusing on the APR, National's employees describe the interest rate in terms that make the cost of the loan seem much lower. At trial, for example, James' counsel and Vazquez had the following exchange:

> Q:    Typically, if someone comes in to borrow $100 at Loan Till Payday, what is the interest rate that they pay?
>
> A:    30 percent
>
> Q:    Your understanding is they pay 30 percent? Is that right?
>
> A:    It's a 30 percent block rate.

Tr. 246 (Vazquez). Vazquez did not know how a 30% block rate compared to an APR. Tr. 254 (Vazquez).

These statements are highly problematic. By "describ[ing] the loan cost in terms of a misleading" bi-weekly rate, National understated the total cost of the Disputed Loan.[30] Because National framed the price as "$30 on $100," James thought she would

---

[30] *State v. B & B Inv. Gp., Inc.*, 329 P.3d 658, 667 (N.M. 2014); *see* Bar-Gill & Warren, *supra*, at 44 ("The fee structure of payday loans makes it difficult for consumers to compare directly the costs associated with a payday loan to the costs associated with other consumer credit products."); *Good While Supplies Last*, *supra*, at 568 ("The data . . . show that many consumers cannot easily compare the cost of this form of credit to other forms of credit, and that many customers are unable to accurately describe how much they will ultimately pay for the small sums they borrow."); *see also id.* at 599-600 (reporting on survey data indicating that many customers do not understand how interest-

pay $60 for the $200 when she actually agreed to pay $1,620 in finance charges. James understood the simple block rate, but she did not understand the more complex financing arrangement captured by the Loan Agreement.

### ii. Lack Of Meaningful Choice

A more significant aspect of the circumstances surrounding the Loan Agreement was James' lack of a meaningful choice. When affirming a finding that a contract of adhesion for membership in a fitness club was not unconscionable, the Delaware Supreme Court observed that "[t]here is no deprivation of meaningful choice if a party can walk away from the contract." *Ketler*, --- A.3d ---, 2016 WL 192599, at *2.

Unlike the choice to spend discretionary income on a fitness contract, James needed money for food and to pay her rent. She lived paycheck to paycheck, had no savings to fall back on, and did not have access to alternative sources of credit. She had reached a point where she was using high-interest, unsecured loans on a regular basis to make ends meet. As a practical matter, James' precarious financial situation meant she did not have meaningful options other than a high-interest loan like the Disputed Loan.

### iii. The Purpose And Effect Of The Loan Agreement

Perhaps the most critical aspect of the bargaining environment was the purpose

---

only loans work, do not know the APR, and cannot predict the total dollar cost of their loan); *id.* at 604 (reporting that customers could not describe fundamental loan terms or explain how much the loan would cost if the borrower needed to kept it out for a month or longer); *id.* at 606 (reporting on survey data indicating that many customers erroneously believe that payday loans are less expensive than credit cards).

and effect of the Loan Agreement, which was to evade the Payday Loan Law. To reiterate, a traditional payday loan was a short-term loan designed to be repaid in a single balloon payment on the borrower's next payday, usually within two weeks or, if the borrower was paid monthly, within one month. *See Consumer Credit*, *supra*, at 356 ("A payday loan is a small, short-term, single-payment consumer loan."). Many borrowers, however, did not repay their loans when the balloon payments were due. When that happened, the payday loan company rolled the outstanding balance into a new payday loan for the total amount of unpaid principal and interest, plus fees. The short-term loan effectively became a longer term loan at the same high interest rate. Consumer advocates regarded the rollover as "[p]erhaps the most dangerous feature of the payday-loan product."[31]

To address the interest-only rollover problem in Delaware, the General Assembly adopted the Payday Loan Law. The synopsis of the bill stated:

> This bill limits to five the number of short-term consumer loans (sometimes called payday loans) that any one borrower may obtain in a twelve month period. It changes the definition of short-term consumer loan to include loans up to $1000 rather than $500. The bill also provides for establishment of a database to track the number of short-term consumer loans an individual has obtained in a twelve month period. Finally, the Banking Commissioner is directed to provide a report on the prevalence and nature of these payday loans to the General Assembly.

---

[31] Bar-Gill & Warren, *supra*, at 55; *accord Good While Supplies Last*, *supra*, at 581 ("Consumer groups consider rollovers a particularly insidious problem because they trap a consumer into potentially paying the interest on a loan indefinitely without ever reducing the principal balance.").

Del. H.B. 289 syn., 146th Gen. Assem. (2012).

The centerpiece of the legislation was the cap on the number of payday loans that

any one consumer could obtain in a single twelve-month period, combined with a

provision that defined a rollover as a new loan. The pertinent statutory language stated:

> Notwithstanding any other provision of law, no licensee shall make, and no
> borrower shall receive, a short-term consumer loan that would cause the
> borrower to have more than five (5) short-term consumer loans from all
> licensees in any twelve-month period. For the purposes of this section a
> rollover or a refinancing shall be considered a short-term consumer loan.
> Any loan made or collected in violation of this paragraph is void, and the
> licensee does not have the right to collect, receive, or retain any principal,
> interest, fees or other charges. A violation of this section is a violation of
> Chapter 25 of Title 6 of the Delaware Code.[32]

---

[32] Chapter 25 of Title 6 of the Delaware Code identifies prohibited trade practices.
Section 2533 of that chapter identifies potential remedies, which include the following:

> (a) A person likely to be damaged by a deceptive trade practice of another
> may be granted an injunction against it under principles of equity and on
> terms that the court considers reasonable. Proof of monetary damage, loss
> of profits, or intent to deceive is not required. . . .

> (b) The court in exceptional cases may award reasonable attorneys' fees to
> the prevailing party. Costs or attorneys' fees may be assessed against a
> defendant only if the court finds that defendant has willfully engaged in a
> deceptive trade practice.

> (c) The relief provided in this section is in addition to remedies otherwise
> available against the same conduct under the common law or other statutes
> of this State. If damages are awarded to the aggrieved party under the
> common law or other statutes of this State, such damages awarded shall be
> treble the amount of the actual damages proved.

> . . . .

> (e) If a court of competent jurisdiction finds that any person has willfully
> violated this subchapter, upon petition to the court by the Attorney General

5 *Del. C.* § 2235A(a)(1) (the "Five Loan Limit"; footnote added). The Five Loan Limit sought to help borrowers avoid being trapped in longer-term, ultra-high interest loans by capping the number of times that payday lenders could roll over payday loans.

Importantly, the Payday Loan Law only applied to short-term consumer loans, which the statute defined as "a loan of $1,000 or less made to an individual borrower that charges interest and/or fees for which the stated repayment period is less than 60 days and is not secured by title to a motor vehicle." *Id.* § 2227(7). But the Payday Loan Law also incorporated an anti-evasion provision, which stated:

> A licensee or licensee's agent shall not engage in any device or subterfuge intended to evade the requirements of this chapter through any method including, but not limited to, mail, telephone, Internet or any electronic means, including:
>
> (1)    Offering, making, or assisting a borrower to obtain a loan in violation of [the Five Loan Limit], or brokering or acting as an agent for a third party in such a transaction, regardless of whether approval, acceptance or ratification is necessary to create a legal obligation for the third party.
>
> (2)    Disguising a short-term consumer loan as a revolving line of credit or making or assisting a borrower to obtain a revolving line of credit for the purpose of avoiding the requirements of [the Five Loan Limit].

*Id.* § 2235A(f) (the "Anti-Evasion Provision").

---

> in the original complaint or at any time following the court's finding of a willful violation, the person shall forfeit and pay to the State a civil penalty of not more than $10,000 for each violation.

6 *Del. C.* § 2533.

The Payday Loan Law was enacted before McFeeters acquired National. Under its prior owner, National responded to the Payday Loan Law by capping the number of times a customer could rollover a payday loan. Loan Till Payday's website described National's "Quick Payday Loan" product as follows:

> *Term*: One pay period (usually 2 weeks or 1 month)
>
> *Fee/Rate*: $20 per $100 borrowed ($30 per $100 borrowed if you get paid monthly)
>
> *Payment Type*: Payment in full due on each pay date. Option to roll over loan 4 times by paying the interest only. After the 4th rollover, payment in full (principle [sic] + interest) is due
>
> *Due*: On each Pay Date[.]

JX 9 at 6. By limiting the customer to four rollovers, National stayed under the Five Loan Limit.

Once McFeeters acquired National, he caused National to stop making payday loans and switch to installment loans. The new structure built the rollover problem into the design of the loan.

In its initial manifestation, National's installment loan product was a seven-month term loan called the Flex Pay Loan. Its economic substance mirrored a one-month payday loan that was rolled over seven times (or a two-week payday loan that was rolled over fourteen times). Loan Till Payday's website described the Flex Pay Loan product as follows:

> *Term*: 7 Months
>
> *Fee/Rate*: $20 per $100 borrowed ($30 per $100 borrowed if you get paid monthly)

65

*Payment Type*: Interest Only, Principle [sic] due at end of loan (Balloon Payment). You can pay more than interest and lower your principle [sic] balance at any time.

*Due*: On each Pay Date[.]

*Id.*; *see* Tr. 272-73 (Vazquez). Because it was designed to be outstanding for seven months, the Flex Pay Loan fell outside the coverage of the Payday Loan Law.

From an economic standpoint, however, the Flex Pay Loan product and the Quick Payday Loan product were functionally equivalent.[33] The Quick Payday Loan product ostensibly contemplated full repayment in one period but could be extended longer with interest-only payments leading to a final balloon payment. The Flex Pay Loan product ostensibly contemplated a series of interest-only payments followed by a final balloon payment, but the customer could pay it off earlier.[34]

National later developed the Flex Loan product that it sold to James. The main difference was that the Flex Loan product contemplated twelve months of bi-weekly, interest-only payments before the final balloon payment.

---

[33] *See* Durkin & Elliehausen, *supra*, at 13 (comparing an installment loan to a single period loan with a finance charge that costs a fixed amount to renew and observing that the resulting APRs are "quite close" because "both are, in effect, installment loans").

[34] The reciprocal nature of the Quick Payday Loan and the Flex Pay Loan is an example of put-call parity, which in turn demonstrates their functional equivalence. A call option gives its holder the right buy property at a contractually-determined strike price; a put option is its mirror image, giving its holder the right to sell property at the strike price. *See* Stewart C. Myers & Richard A. Brealey, *Principles of Corporate Finance* 566 (7th ed. 2003). Call and put options with the same terms provide identical payoffs, no matter the value of the underlying property. *Id.* at 572. This means call and put options are functionally equivalent and that a call option can be reframed as a mirror image put option to obtain the same financial result.

Put simply, National designed its installment loan products to evade the Five Loan Limit. From National's standpoint, the shift was actually beneficial, because the new products built the concept of interest-only rollovers into the loans themselves.

The Anti-Evasion Provision recognized the risk that a lender might disguise "a short-term consumer loan as a revolving line of credit." 5 *Del. C.* § 2235A(f)(2). National took the opposite approach. It disguised a short-term consumer loan as an interest-only, non-amortizing installment loan. National's shift to interest-only installment loans as a means of evading the Five Loan Limit followed a strategy employed by payday lenders in other jurisdictions.[35]

---

[35] *See State v. B & B King Inv. Gp., Inc.*, 329 P.3d 658, 663, 673-74 (N.M. 2014) (noting that in response to legislation in New Mexico and Illinois that limited short duration loans, providers restructured their products as installment loans; holding that under New Mexico law, restructured installment loan was unconscionable because, among other reasons, it was "specifically designed to make an end run around the consumer protections of the Small Loan Act"); JX 44 at 5 (opining that in response to laws limiting short duration loans, "[a] typical lender work-around is to offer only longer loans to which the legislation does not apply. This change in practice has led to high cost 'installment loans.'"); *Good While Supplies Last*, *supra*, at 579 (same); *Interest Rate Caps*, *supra*, at 119 (explaining that payday lenders in New Mexico responded to a state law regulating short-term loans by creating an "installment loan" that required repayment in "twenty-six bi-weekly installments" with an APR of 1,147%); Robert Mayer, *One Payday, Many Payday Loans: Short-Term Lending Abuse in Milwaukee County* (Working Paper, Aug. 6, 2009) (noting that payday lenders in Illinois responded to a state law regulating cash advances of 30-days or less by creating a 31-day cash advance); *Public Opinion*, *supra*, at 268 (explaining that "[l]enders making installment loans can avoid state payday loan laws by making loans with [longer] durations"); *see also* Paul Kiel, *How Payday Lenders Escape State Crackdowns*, Mother Jones, Aug. 7, 2013 (explaining that payday lenders respond to legislation by modifying their products, noting that "[t]he most popular alternative to payday loans are 'longer term, but still very high-cost installment loans,'" and citing Delaware's Payday Loan Law as an example of legislation that can be circumvented using alternative products such as "a seven-month

67

### 3.      Balancing The Factors

All of the *Fritz* factors point in favor of a finding of unconscionability, albeit to varying degrees. The most telling factors include (i) the economic terms of the Disputed Loan, which support a *prima facie* case of substantive unconscionability, (ii) the purpose and effect of the installment loan structure in circumventing the Payday Loan Law and the Five Loan Limit, and (iii) the exploitation of an underprivileged, undereducated, and financially vulnerable person. Secondary factors include (a) the use of a contract of adhesion, (b) the overall imbalance of rights and obligations, and (c) National's practices when describing the block rate finance charge versus the APR, which present a misleading picture of the cost of credit.

On balance, the Loan Agreement is unconscionable. No one would borrow rationally on the terms it contemplated unless that person was delusional, mistaken about its terms or a material fact, or under economic duress.

### 4.      The Remedy For The Unconscionable Agreement

Because the Loan Agreement is unconscionable, it is voidable. The proper remedy is to declare it invalid. *See* Restatement (Second) of Contracts § 208, cmt. g.

Declaring the Loan Agreement invalid is likewise appropriate because National sought to use an interest-only, non-amortizing, installment loan to evade the Payday Loan Law. "Equity always attempts to . . . ascertain, uphold, and enforce rights and duties

---

installment loan"), *available at* http://www.motherjones.com/politics/2013/08/payday-lending-state-laws.

which spring from the *real* relations of parties." 2 John Norton Pomeroy, *Equity Jurisprudence* § 378, at 41 (Spencer W. Symons ed., 5th ed. 1941). "[E]quity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983). Equity also "regards that as done which in good conscience ought to be done." *Id.* In substance, the Disputed Loan was a payday loan designed to roll over twenty-six times, which contravened the Five Loan Limit.

National loaned James $200. James has repaid National $197. As a consequence of rescinding the Loan Agreement, James owes National another $3. James may satisfy this obligation by setting it off against amounts that this decision orders National to pay.

James also asked for a permanent injunction barring National from collecting on similar loans it made to other customers. That relief is too broad to be granted in the current case and would embroil this court in on-going oversight of National's business.

## C.    The Truth In Lending Act

James separately provided at trial that National violated TILA. Originally enacted in 1968, TILA's stated goal is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). The Board of Governors of the Federal Reserve System implemented this disclosure-based regime through Regulation Z, which requires lenders to calculate and disclose interest rates according to a prescribed formula. *See* 12 C.F.R. part 226 (2011). Consumers have standing to enforce the Federal Reserve's rules through private litigation. *See* 26 *Causes*

*of Action* 2d § 409 (2004).

TILA applies to closed-end consumer credit transactions like the Disputed Loan.[36]

A lender violates TILA if it discloses an APR on a consumer loan that is "more than 1/8

of 1 percentage point above or below" the APR determined in accordance with certain

actuarial methods. 12 C.F.R. § 226.22(a)(2). There is a statutory defense for inadvertent

mistakes made in good faith:

> A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error.

15 U.S.C. § 1640(c) (the "Bona Fide Error Defense"). For purposes of APR calculation

errors, the Federal Reserve has issued a regulation providing that a creditor can establish

a Bona Fide Error Defense by proving that "(1) [t]he error resulted from a corresponding

error in a calculation tool used in good faith by the creditor; and (2) upon discovery of the

error, the creditor promptly discontinue[d] use of that calculation tool for disclosure

purposes and notifie[d] the [Federal Reserve] in writing of the error in the calculation

tool." 12 C.F.R. § 226.22(a)(1) n.45d. This decision applies the regulatory test for the

---

[36] 15 U.S.C. § 1638; *see In re Ferrell*, 358 B.R. 777, at *783 (B.A.P. 9th Cir. 2006) ("TILA applies to payday loans . . . ."), *aff'd*, 539 F.3d 1186 (9th Cir. 2008); Open-End Credit, 65 Fed. Reg. 17,129 (Mar. 31, 2000) (final rule issued by the Federal Reserve clarifying that Regulation Z applies to payday loans).

Bona Fide Error Defense because it speaks specifically to an APR calculation error. *Cf. Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 557 (1980) (stating that courts should give "a high degree of deference" to the Federal Reserve's interpretation of TILA).

As a sanction for National's discovery misconduct, this court previously determined that the "APRs for the loans disclosed on the Updated Spreadsheet fell outside the acceptable range set forth in TILA." *James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *13 (Del. Ch. Dec. 5, 2014). The Disputed Loan was one of the loans on the spreadsheet. The operative question is whether National established a Bona Fide Error Defense.

National failed to prove its Bona Fide Error Defense. Although National claims to have relied on computer software to calculate the APR, the Delaware Bank Commissioner told National on multiple occasions that it had concerns about National's APR calculations. National did not promptly discontinue its use of its computer software and did not provide notice in writing to the Federal Reserve. National only discontinued its use of the software in 2014, a year after making the Disputed Loan.

TILA contemplates an award of actual damages if the plaintiff proves that she relied on the incorrect APR. *See, e.g.*, *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1026-28 (11th Cir. 2001) (collecting cases and analyzing TILA's history). James did not rely on the incorrect figure, so she cannot recover actual damages.

TILA also contemplates statutory damages. 15 U.S.C. § 1640(a)(2). In the event of a violation, a court should award "in the case of an individual action twice the amount of any finance charge in connection with the transaction." *Id.* § 1640(a)(2)(A)(i). The

71

finance charge "is the cost of consumer credit as a dollar amount" and includes interest, transaction charges, fees, and any other charges other than repayment of principal. 12 C.F.R. § 226.4(a)-(b).

The finance charge for the Disputed Loan was $1,620. Twice this amount is $3,240. Offsetting the $3 that James still owes National results in a judgment for James in the amount of $3,237.

TILA directs the court to award reasonable attorneys' fees and costs "in the case of any successful action to enforce" liability under § 1640(a)(2)(A)(i). 15 U.S.C. § 1640(a)(3). James is entitled to a fee award.

## III. CONCLUSION

The Disputed Loan is invalid. Judgment is entered in favor of James in the amount of $3,237. Pre- and post-judgment interest on this amount will accrue at the legal rate, compounded quarterly, beginning on May 7, 2013. James is awarded her attorneys' fees and costs. Counsel shall submit a Rule 88 affidavit. If the parties can agree on an amount, then they shall submit a form of final order and judgment that is agreed as to form. Otherwise they shall propose a schedule for a fee application.